**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leo Tom HOPKINS, Defendant-
Appellant.**

**No. 27951.**

United States Court of Appeals,
Fifth Circuit.

Nov. 9, 1970.

Rehearing Denied Dec. 17, 1970.

James P. Screen, Guy Johnson, New Orleans, La., for defendant-appellant.

Eldon B. Mahon, U. S. Atty., B. H. Timmins, Jr., Charles D. Cabaniss, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before TUTTLE, WISDOM, and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Leo Tom Hopkins was convicted by a jury on January 25, 1968, for transporting a stolen 1966 Chevrolet automobile from Illinois to Texas in violation of the Dyer Act, 18 U.S.C.A. § 2312. On this appeal, Hopkins raises two basic issues: (1) whether or not the trial court erred

in admitting into evidence the fruits of a warrantless search of the 1966 Chevrolet automobile, and (2) whether or not the trial court erred in admitting into evidence statements made by appellant to federal and state officers. Disagreeing with appellant's contentions on both issues, we affirm the conviction below.

Hopkins' primary contention is that it was reversible error for the trial court to admit into evidence testimony concerning the manufacturer's serial number of the stolen 1966 Chevrolet automobile which Dallas police observed inside the car. On October 27, 1967, Hopkins was arrested by Dallas police and jailed on a state assault charge. While Hopkins was in jail, on October 29, 1967, the Dallas police received an anonymous telephone call from a woman, reporting that Hopkins had stolen a car in Illinois and brought it to Dallas. She said that this automobile, a 1966 Chevrolet bearing Illinois license plates, was parked on a Dallas street in the vicinity of Hopkins' apartment. Dallas police officers went to the scene and recorded the license plate number of this car, ascertained from Illinois authorities that these plates were registered to a different car, and towed the car away. Following impoundment, but on the same day, a Dallas police officer conducted a brief investigation of the car. He unlocked the front door with Hopkins' key and examined the plate affixed to the door post to determine the vehicle identification number. After examining this plate, the police officer removed it because its appearance led him to believe that it was not the original plate affixed to the car by the manufacturer. On the next day, October 30, the same officer again investigated the car to locate a confidential identification number secreted on the vehicle by the manufacturer. This investigation, which lasted about an hour and a half, produced the information that the manufacturer's confidential number did not correspond with the number on the door post plate. During these investigations of the automobile the car remained impounded, Hop-

kins was secured in jail, and the Dallas police never obtained a search warrant. Subsequently this confidential identification number was testified to at trial over Hopkins' objection.

Hopkins contends that while the 1966 Chevrolet was validly in possession of the Dallas police, information concerning the identification number observed on October 30, was inadmissible because it constituted the fruits of a warrantless search invalid under the Fourth Amendment. While this argument once might have raised serious questions, we think that our decision in United States v. Johnson, 5 Cir. 1970, 413 F.2d 1396, aff'd en banc, 431 F.2d 441, is indistinguishable in all relevant particulars and compels rejection of Hopkins' allegations. We quote the en banc opinion in its entirety:

> "PER CURIAM: The Court en banc is of the opinion that the panel correctly decided that inspections of motor vehicles performed by police officers, who were entitled to be on the property where the vehicles were located, which in no way damaged the vehicles and were limited to determining the correct identification numbers thereof were not searches within the meaning of the Fourth Amendment; and that alternatively, if either of such inspections constituted a Fourth Amendment search, then no search warrant was necessary because such inspections were reasonable and did not violate the right of the people to be secure in their persons, houses, papers or effects. To the extent that Glisson v. United States, 406 F.2d 423 (5th Cir. 1969) would find such a search or inspection constitutionally infirm, that decision is expressly overruled by this opinion." [Footnote omitted.]

Hopkins further objects to the admission into evidence of statements he made to law enforcement officials while incarcerated in the Dallas jail. After the Dallas police had made their discoveries concerning the 1966 Chevrolet automo-

bile, they passed this information on to the FBI. On November 2, 1967, Hopkins was taken from the fifth floor of the Dallas jail to a third floor interrogation room for a meeting with FBI Agent Hanley. This meeting, with only Hopkins and Hanley present, lasted less than an hour. Agent Hanley first introduced himself and informed Hopkins that he wished to talk with him about a car that had apparently been stolen, transported interstate, and found near Hopkins' apartment. Hanley then handed Hopkins a card containing the *Miranda* warnings, see Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Hopkins took the card and read it, but refused to sign a waiver of his constitutional rights. The record then reveals that the following occurred:

"Q All right, sir. After that was presented to the defendant, what did he say to you?

A He said he didn't want to sign it.

Q All right, what did you reply to him?

A Well, I told him I had wanted to talk to him about this automobile, but if he didn't want to sign this form, that I would leave.

Q All right.

A And I got up to leave.

Q All right, what did he say?

A Well, he said 'I didn't steal the car in the first place.'

Q What did you tell him?

A I sat down again and I told him that we were wanting to investigate and get to the bottom of it, how the car got down here from Illinois and if he could give me some lead if he could bring up somebody else who had brought the car down, I would pursue the investigation from there."

In response to Hanley's query, Hopkins stated that he had come down from the Chicago area with a man named "Hanson" who had driven the 1966 Chevrolet. Hopkins further stated that, after the two arrived in Dallas, Hanson had left

the car with Hopkins to use but had never made any effort to get the car back.

At the conclusion of this interrogation, Dallas Police Detective Hobbs, who had not been present, returned Hopkins to the fifth floor of the jail. On this return trip, Hobbs, without apprising Hopkins of his constitutional rights, asked Hopkins, "How did you get the old car down"? According to Hobbs, Hopkins replied that he "brought the car down from Chicago."

Hopkins lodges several objections to the admissibility of both statements. We first direct our attention to the statements made to Agent Hanley. Hopkins contends that this statement was inadmissible because it resulted from "the confrontation of the accused with the evidence of an illegal search." By this characterization Hopkins apparently means that the statement is tainted because Hanley's revelation that the 1966 Chevrolet was stolen was based upon information derived from the investigation of the automobile by the Dallas police. Since we have held that the investigation of the automobile was consistent with Fourth Amendment protections, we reject this contention.

■ Hopkins next argues that the incriminating statements were inadmissible because of "the excessive confinement before interrogation." Hopkins contends that any resulting admission was "coerced." While it is true that Hopkins had been in jail for seven days preceding his interrogation by Agent Hanley, his confinement was on a state charge totally unrelated to the Dyer Act charge. When the FBI did receive information about the stolen car, they interrogated Hopkins promptly. There is nothing in the record to indicate that Hopkins was confined for any excessive period of time for the purpose of coercing him to make a confession concerning the Dyer Act charge.

■ Hopkins finally contends that the incriminating statement was inadmissible because of his failure "to intel-

ligently waive his right not to incriminate himself." Hopkins argues that after he refused to sign a written waiver of his constitutional rights, Agent Hanley should have immediately terminated the interrogation. Any statement made to Hanley after this refusal to sign the waiver must therefore be considered inadmissible. This argument is without merit. The undisputed facts reveal that after Hopkins refused to sign the waiver, Hanley indeed attempted to terminate the interrogation. It was Hopkins who initiated the subsequent conversation by insisting that he "didn't steal the car in the first place." While *Miranda* places upon the Government a heavy burden both with regard to inculpatory and exculpatory remarks "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," 384 U.S. at 475, 86 S.Ct. at 1628, we feel this burden has here been clearly met. There is no evidence that Hanley persisted in interrogating Hopkins despite his refusal to waive his constitutional rights. Nor is there evidence that Hopkins manifested inconsistent conduct because of confusion. See United States v. Nielsen, 7 Cir. 1968, 392 F.2d 849. Rather, the record shows that Hopkins, after refusing to waive his rights and upon seeing Hanley get up to leave, initiated the ensuing conversation in order to exculpate himself. The ensuing questions asked by Hanley were simply designed to pursue the line of inquiry begun by Hopkins. This case then resembles those instances where the accused voluntarily confesses prior to questioning. United States v. Welsh, 5 Cir. 1969, 417 F.2d 361; Stone v. United States, 10 Cir. 1967, 385 F.2d 713; Lamb v. Peyton, W.D.Va.1967, 273 F. Supp. 242. We feel that the following language of the Fourth Circuit is particularly relevant to the present case:

"Thompson complains that an oral confession given to agents of the F.B. I. was admitted even though he had refused to sign a written waiver of

his rights. The evidence discloses that Thompson, an intelligent man, was informed of his rights in the manner required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). He declined to sign a written waiver, but he stated that he understood his rights. Thereafter he freely and voluntarily answered questions. He was not subjected to prolonged interrogation or in any way coerced. In view of Thompson's intelligence, his affirmative statement that he understood the explanation of his rights, and the voluntariness of his confession, we hold that his refusal to sign a written waiver did not render the confession inadmissible. United States v. Hayes, 385 F.2d 375 (4th Cir. 1967), cert. denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968)." United States v. Thompson, 4 Cir. 1969, 417 F.2d 196, 197, cert. denied, 1970, 396 U.S. 1047, 90 S.Ct. 699, 24 L.Ed.2d 692.

We therefore hold that Hopkins waived his constitutional privilege so that his statements to Agent Hanley are admissible.

■ A more serious question exists with respect to the statement Hopkins made to Dallas Police Detective Hobbs. The Government, however, insists that Hopkins may not raise this issue on appeal because he failed to raise a timely objection at trial. While there may be some ambiguity, it appears that prior to trial Hopkins filed a motion to suppress both the statement made to Agent Hanley and the statement made to Detective Hobbs. Even though Hopkins' counsel failed to object again to the admission of Hobbs' statement at trial, we hold that his pre-trial motion was sufficient to preserve this issue on appeal. See 3 C. Wright, Federal Practice and Procedure § 842, at 342–47 (1969).

The record shows that the statement made to Detective Hobbs took place under the following circumstances. Hobbs, a Dallas police detective, was not present

during the federal interrogation where Hopkins was apprised of his constitutional rights. Nor did Hobbs precede his inquiry by giving Hopkins the *Miranda* warnings. The Government argues that despite this failure to repeat the warnings, Hopkins was fully aware of his rights by virtue of the prior conversation with Agent Hanley. Any subsequent statement made to Detective Hobbs was thus the result of a conscious waiver. Hopkins, on the other hand, contends that while the warning given to him by FBI Agent Hanley might have cleansed the federal interrogation, it did not necessarily sanitize the subsequent statement made to Dallas Police Detective Hobbs. In effect, Hopkins argues that he reasonably assumed that his privilege with respect to state interrogations was not co-extensive with that against federal questioning. Hopkins had been in the Dallas jail on an unrelated state charge for seven days, and at no time had a Dallas police official informed him of his constitutional rights. Given these facts, Hopkins contends that it should not be assumed that he understood that his *Miranda* rights applied to the question asked by Detective Hobbs. Rather, Detective Hobbs should have preceded any question he might have desired to ask by explaining to Hopkins his constitutional rights vis-a-vis the state.

 Hopkins' argument has some merit. The *Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity. There may be occasions where interrogation by one authority, be it state or federal, is so disconnected with interrogation by the other as to compel a reiteration of the *Miranda* warnings. Nevertheless, on the basis of this record, and in light of the following factors, we must reject Hopkins' contentions. First, there was no significant time lapse between the federal interrogation and Detective Hobbs' question. Second, the question posed by Detective Hobbs touched upon the same subject matter discussed with Agent Hanley. Third, there is no evidence

that the Dallas police, either prior to or following the federal interrogation, acted so as to dilute the efficacy of the warning given by Agent Hanley. This record pictures an uninterrupted sequence of events beginning with the *Miranda* warnings given by Agent Hanley, including the presence of Hobbs at the third floor interrogation room to take Hopkins to his cell, and culminating with a question on the same matter posed by Hobbs as he and Hopkins returned to the fifth floor. We find that the question of Detective Hobbs was so intertwined with the interrogation by Agent Hanley that Hopkins must have been aware of his constitutional rights with regard to Hobbs' query and, by his answer, Hopkins knowingly waived those rights. See Maguire v. United States, 9 Cir. 1968, 396 F.2d 327; cf. United States v. Osterburg, 9 Cir. 1970, 423 F. 2d 704, cert. denied, 399 U.S. 914, 90 S. Ct. 2216, 26 L.Ed.2d 571; Connors v. South Dakota, 8 Cir. 1970, 422 F.2d 122, cert. denied, 398 U.S. 954, 90 S.Ct. 1881, 26 L.Ed.2d 297.

The judgment is affirmed.