STATE OF NORTH CAROLINA v. JOHN PERRY FISHER

No. 746A85

(Filed 18 November 1986)

### 1. Homicide § 21.5— premeditation and deliberation—sufficient evidence

There was sufficient evidence of premeditation and deliberation to support defendant's conviction of first degree murder by stabbing the victim where the State's evidence tended to show: there was no provocation on deceased's part; defendant had commented during the preceding fall that if deceased "messes with me one more time, I'm going to cut his heart out"; defendant commented on the day of the murder that "I'm going to get drunk with [deceased] one last time tonight"; defendant commented several days after the stabbing that he ran deceased down and killed him because "I knowed he'd come back and get me"; and the killing was done in a brutal manner in that there were multiple stab wounds, including two wounds to the chest, one of which pierced deceased's heart.

### 2. Homicide § 19— deceased's conviction record—continued questioning of defendant

The trial court in a murder case did not err in allowing the State to continue to ask defendant about deceased's conviction record where the trial court sustained defendant's objections to this line of questioning, and defense counsel never asked the court to restrain the State from asking these questions but merely asked for a precautionary instruction. Moreover, any error in the court's failure to give a precautionary instruction was not prejudicial to defendant.

### 3. Criminal Law § 128.2— questions about knife—denial of mistrial

The trial court in a homicide case did not err in denying defendant's motion for a mistrial based on the State's cross-examination of defendant about whether he had slashed another person with the knife used to stab deceased where the trial court sustained defendant's objections to this line of questioning, and the record shows that the prosecutor's questions about the knife were asked in good faith.

### 4. Criminal Law § 75.8— second interrogation—failure to repeat Miranda warnings

A statement made by defendant during a second interrogation was not inadmissible because defendant was not given renewed *Miranda* warnings before the second interrogation began where the length of time between the initial warning and interrogation and the second interrogation was very brief; the statement was made in the same building only a short distance from where the initial interrogation occurred; the statement was made to an officer who was present at the initial interrogation; defendant's second statement did not materially differ from his initial statement; and defendant appeared to be of sound mind and not under the influence of alcohol or any other drug when the second statement was made. The totality of the circumstances shows that the initial *Miranda* warnings were not so stale and remote as to create a substan-

tial possibility that defendant was unaware of his constitutional rights during the second interrogation.

**5. Homicide § 30.3— instruction on voluntary manslaughter not required**

The trial court in a first degree murder case did not err in refusing to charge the jury on involuntary manslaughter where defendant admitted that he knowingly slashed and stabbed deceased with a hunting knife but contended that he acted in self-defense.

**6. Criminal Law § 102.6; Homicide § 19.1— jury argument—failure to introduce victim's criminal conviction record—harmless error**

In a first degree murder case in which defendant contended that he stabbed the victim in self-defense, the prosecutor's assertion in his closing argument that defendant failed to introduce evidence of the victim's criminal conviction record to show that the victim was a mean and violent person was arguably misleading and improper, but the impropriety did not constitute reversible error where substantial evidence had been admitted which tended to show that the victim had served time in prison and had a reputation for violence.

**7. Criminal Law § 102.5— prior convictions—cross-examination of defendant—improper question—absence of prejudice**

Cross-examination of defendant about whether he had been convicted of breaking and entering and larceny in 1976 when in fact he had not been involved in those crimes did not constitute prejudicial error where defendant responded that he did not remember being convicted of either crime; defendant objected only on the ground that the two crimes were juvenile offenses; the prosecutor made a good faith effort to examine the record before using such evidence at trial and was not aware that the two cases were not part of defendant's juvenile or adult criminal record; and the prosecutor offered defense counsel the opportunity to check defendant's record before going any further.

**8. Constitutional Law § 48— counsel's admission of malice—no ineffective assistance of counsel**

A defendant tried for first degree murder was not denied the effective assistance of counsel because his counsel admitted malice without defendant's consent in his closing jury argument.

BEFORE *Allen, J.,* at the 24 June 1985 Criminal Session of Superior Court, TRANSYLVANIA County, the defendant was convicted of first-degree murder. The jury found no aggravating factors as listed in N.C.G.S. § 15A-2000(e) and therefore unanimously recommended that the defendant be sentenced to life imprisonment. The defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 11 September 1986.

*Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General and Norma S. Harrell, Assistant Attorney General, for the State.*

*Jeffrey P. Hunt, for the defendant-appellant.*

BROWNING, Justice.

The State presented evidence which tended to show that the defendant, John Perry Fisher, and the deceased, Claude Allen Hill, had been "best friends" for a number of years; that on the evening of 3 September 1984 the defendant and Hill drove in the defendant's wife's car to a party at the home of Brenda Fisher; and that the defendant and Hill had been drinking beer and liquor, as well as smoking marijuana, earlier that same day and that they were "high off of liquor" prior to attending the party. There was also evidence that the defendant had threatened Hill with a knife in a dispute over a bottle of liquor earlier in the day.

Once at Brenda Fisher's residence and during the course of the party, Hill "patted" the defendant on the face in a playful gesture. The defendant became agitated and told Hill that he couldn't slap him like that and get away with it. Shortly thereafter the defendant stood up, kissed Hill and stated "we're all brothers." Witnesses at the party observed that the defendant had in his possession during the party a knife with a blade "at least" eight inches long.

Soon after this incident, Hill accompanied Joyce Ewbanks into the kitchen. The defendant followed them into the kitchen whereupon Hill asked him to leave so he could talk privately with Joyce. The defendant became very angry and returned to the living room saying "he was mad at the world." The defendant then left the house saying that he was going home. Several minutes later Hill and Joyce Ewbanks returned to the living room where Hill got his coat and said that he was going with the defendant. Joyce Ewbanks followed Hill because she had left her pocketbook in the defendant's car.

As Joyce Ewbanks and Hill walked to the car, Joyce asked Hill to stay and said that she would take him home later. Hill agreed and Joyce proceeded to the car where she obtained her pocketbook and said good-bye to the defendant. At that time, Hill

was standing approximately seventy-five feet from the car. Joyce began walking back towards Brenda's apartment where she met Hill. The defendant started his car and began backing it out of the driveway into the road. When the defendant reached the end of the driveway he tossed a carton of Hill's cigarettes, which Hill had left in the defendant's car, out the window, scattering them on the muddy, rain soaked ground. Hill told the defendant, "Johnny, I don't appreciate that." Whereupon, the defendant opened the car door and said "come do something about it." Hill walked to the bottom of the driveway and met the defendant. After a brief scuffle Hill backed away and ran down the road. The defendant gave immediate pursuit and upon catching him, another scuffle ensued. Seeing that the defendant and Hill were fighting, Joyce ran to Brenda's apartment to get help. Roy Norton accompanied Joyce back outside where they met the defendant walking back towards the driveway. Joyce asked the defendant where Hill was and he answered "the S.O.B. is lying down there." Joyce immediately ran down the road and found Hill lying in the ditch. Joyce then ran back towards Brenda's apartment to get help. As she neared the apartment, she saw Norton crawling out of the ditch. Norton told her that the defendant "beat the hell out of me too."

Ms. Emily Smith, a neighbor of Brenda Fisher's, testified that at approximately 11:00 p.m. she looked out of her kitchen window and saw the defendant making fast jabbing motions with his hand at an unidentified boy who was unarmed and attempting to get away. Ms. Smith saw the defendant chase Hill down the road and push him into the ditch.

Hill was dead by the time the police arrived at the scene. The autopsy performed the next day by Dr. Robert Dowlswell, a forensic pathologist, revealed multiple stab wounds on the deceased's body, one of which penetrated the victim's heart causing great loss of blood. In Dr. Dowlswell's opinion, Hill's death was caused by blood loss related to the stab wound to the heart.

The State supplied further evidence which tended to show that earlier in the day on 3 September 1984 the defendant had stated that he was "going to get drunk with Allen one last time." Additional evidence was introduced that during the preceding fall, the defendant had stated that "if Allen messes with me one

more time I'm going to cut his heart out." Further, the State presented evidence that the defendant ran Hill down and killed him because "I knowed he'd come back and get me."

The defendant presented evidence which tended to show that while at Brenda Fisher's residence Hill had asked the defendant to take him to another party and that the defendant refused. Upon leaving, the defendant, realizing that Joyce Ewbanks' purse was in his car, stopped the car in order to return the purse. At this time Hill walked up beside the car, cursed the defendant and hit the defendant in the temple. The defendant told Hill that he did not want to fight but Hill continued to hit the defendant in the head. The defendant testified that he knew that "once he [Allen] got me down that was it." The defendant further testified that in order to defend himself he pulled out his knife and began indiscriminately cutting and jabbing Hill. The defendant testified that during this time he was covering his eyes with his arm in order to protect his face and therefore could not see that he had mortally wounded Hill.

The defendant testified that Hill finally stopped hitting him and backed away. After backing away, Hill began to run away from the defendant, whereupon the defendant ran after Hill to help him and keep him from wandering off into the ditch. The defendant further testified that when he saw that Hill was badly hurt he immediately went to the car in an effort to get help for him.

Based on this and other evidence, the jury found the defendant guilty of first-degree murder. The court entered judgment sentencing the defendant to a term of life imprisonment.

I.

[1] The defendant contends that the trial court erred by submitting to the jury the charge of first-degree murder. This contention is based on the claim that there was insufficient evidence of premeditation and deliberation to reach the jury on the issue of first-degree murder.

Substantial evidence must be introduced tending to prove each essential element of the offense charged before the defendant's guilt may be submitted to the jury. *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982). However, substantial evidence,

although it must be existing and real, need not exclude every reasonable hypothesis of innocence. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). In considering a motion to dismiss, "[t]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. . . ." *State v. Powell*, 299 N.C. 95, 99, 261 S.E. 2d 114, 117 (1980).

First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979); N.C.G.S. § 14-17. "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Brown*, 315 N.C. 40, 58, 337 S.E. 2d 808, 822 (1985). "Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* The requirement of a "cool state of blood" does not require that the defendant be calm or tranquil. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). An unlawful killing is deliberate and premeditated if done as part of a fixed design to kill, notwithstanding the fact that the defendant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason. *Id.*

Premeditation and deliberation relate to mental processes and ordinarily are not subject to proof by direct evidence. Instead, they are generally proved by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are (1) provocation on the part of the deceased; (2) conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence

that the killing was done in a brutal manner. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983).

In this case there is evidence of want of provocation on the part of the deceased in that the defendant's invitation to "come do something about it" was intended, and did, provoke the altercation that ensued. Additionally, several comments made by the defendant suggest premeditation and deliberation. Specifically, a comment was made by the defendant during the preceding fall that if "Allen messes with me one more time, I'm going to cut his heart out" and a comment was also made on the day of the murder that "I'm going to get drunk with Allen one last time tonight." Lastly, the defendant's comment several days after the stabbing that he ran Hill down and killed him because "I knowed he'd come back and get me," suggests premeditation and deliberation.

Additionally, we find that there was evidence that the killing was done in a brutal manner. Specifically, Dr. Dowlswell testified that there were multiple stab wounds including two wounds to the chest, one of which hit the deceased's heart. This Court has held that the nature and number of a victim's wounds is a circumstance from which premeditation and deliberation can be inferred. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982).

Using the factors set forth in *Williams*, this Court finds the State put forth substantial evidence sufficient to justify the trial court's denial of defendant's motion to dismiss. This assignment of error is overruled.

II.

[2] The defendant next contends that the trial court erred in allowing the State to continue to ask the defendant about the deceased's conviction record. This assignment of error is based upon the following exchange:

Q. I want you to turn to this Jury like you've been doing for the last hour and tell the Jury how many times Allen Hill was ever convicted in Court for any act of violence against any of those 100 people, tell them?

MR. BLANCHARD: Objection.

THE COURT: Sustained.

Q. Isn't the truth of the matter, Mr. Fisher, and you know of at least 50 to 100 people that were assaulted terribly in this county that none of those so called assaults ever resulted in the man being convicted one time in Court anywhere?

MR. BLANCHARD: Objection.

THE COURT: Overruled.

Q. Isn't that right?

A. Sir, he was up for trial for about 8 of them right before he died. So I guess he wouldn't convicted of them, sir.

Q. You mean he was tried for 8 assaults before he died?

A. No, I'm saying he was up for at least four because they was counts took out for him. The policemen took some on him.

Q. At least 50 to 100 assaults, they didn't all occur right before he died, did they?

A. No sir, but it's like this, if a man fought you would you take a warrant out on him?

Q. Listen to my question. When did these 50 to 100 assaults in this county start, how many years ago?

MR. BLANCHARD: Objection.

THE COURT: Overruled.

Q. When did you first come to know of these 50 to 100 assaults this man did?

A. All of our life.

Q. And how old was he, 25?

A. He was 25.

Q. Tell the Members of the Jury then when in the last 25 years Mr. Hill was ever convicted of even simple assault?

MR. BLANCHARD: Objection.

THE COURT: Objection Sustained.

Q. Well, wasn't he or was he?

MR. BLANCHARD: Objection.

THE COURT: Objection Sustained.

Q. You would tell it if that was the truth, wouldn't you?

MR. BLANCHARD: Objection.

THE COURT: Objection Sustained.

MR. BLANCHARD: Your Honor, I would like a precautionary instruction to the Jury as to regard Mr. Leonard's questions.

The record shows that the trial court sustained the defendant's objections to this line of questioning. Further, the defendant's counsel never asked the court to restrain the State from asking these questions but merely asked for precautionary instruction. This request was denied without explanation. Lastly, even if the failure to give a precautionary instruction is held to be error, it does not appear from the record that the error was prejudicial error within the meaning of N.C.G.S. § 15A-1443(a). That is, it does not appear that but for the trial court's error, there was a reasonable possibility that the result would have been different from that which occurred. *State v. Milby*, 302 N.C. 137, 142, 273 S.E. 2d 716, 720 (1981).

For the reasons cited above, this Court finds that the trial court did not err in denying the defendant's request for a precautionary instruction as to the State's questions concerning the victim's criminal record. This assignment of error is overruled.

### III.

[3] The defendant next contends that the trial court erred in denying his motion for a mistrial based upon the State's cross examination of the defendant. Specifically, the defendant objects to the following exchange during the cross examination of the defendant:

Q. And then, Mr. Fisher, in uh on the 21st day of July, 1983, did you assault Vicky Gontz with a deadly weapon a

hunting knife with a five inch blade by cutting her in the chest?

A. No sir.

Q. You didn't do that?

A. No sir.

Q. On that day, if this is not the very huntin' knife that you slashed Vickie Gontz in the chest with?

MR. BLANCHARD: Objection.

A. God as my witness, no.

THE COURT: Objection Sustained.

In *State v. Primes*, 314 N.C. 202, 215, 333 S.E. 2d 278, 286 (1985) this Court held that "the decision whether to grant a motion for mistrial rests within the sound discretion of the trial judge and will not ordinarily be disturbed on appeal absent a showing of abuse of that discretion." "The rule in this jurisdiction is that questions of the prosecutor will be considered proper unless the record shows that the question was asked in bad faith." *State v. Dawson*, 302 N.C. 581, 586, 276 S.E. 2d 348, 352 (1981).

In this case, the trial court correctly sustained the defendant's objections to the prosecutor's line of questioning. However, based on the State's showing of good faith in regard to its line of questioning, the trial court denied the defendant's motion for a mistrial. The specific statement of the prosecutor is as follows:

MR. LEONARD: Yes sir, I would like to state my good faith basis first for their second objection. Mr. Fisher was charged with that offense. I read the words of the warrant and let me see if I can put my hands on that, Judge. It reads that he assaulted the victim with a hunting knife with a blade of some several inches in length I believe and I felt it was a fair inference that this may well be the same blade or same knife. I think he certainly had the opportunity to explain it if he wanted to that he only had that knife for a short time.

There is sufficient evidence in the record to show that the prosecutor's questions as to the knife were asked in good faith. We hold that the trial judge did not abuse his discretion in denying the defendant's motion for a mistrial. This assignment of error is overruled.

## IV.

**[4]** The defendant, in his next assignment of error, contends that the trial court erred in allowing into evidence the statement made by the defendant during a second interrogation when the defendant was not given a renewed *Miranda* warning before the second interrogation began.

In the case of *State v. McZorn*, 288 N.C. 417, 219 S.E. 2d 201 (1975), *death penalty vacated*, 428 U.S. 904, 49 L.Ed. 2d 1210 (1976) this Court considered the question of whether *Miranda* warnings must be repeated at subsequent interrogations when they have been properly given at the first interrogation. In *McZorn*, the Court said that:

> [A]lthough *Miranda* warnings once given, are not to be accorded 'unlimited efficacy or perpetuity,' when no inordinate time elapses between the interrogations, the subject matter of the question remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required.

*McZorn*, 288 N.C. at 433, 219 S.E. 2d at 212 (*quoting U.S. v. Hopkins*, 433 F. 2d 1041 (5th Cir. 1970) ). "However the need for a second warning is to be determined by the 'totality of the circumstances' in each case." *McZorn*, 288 N.C. at 434, 219 S.E. 2d at 212 (*quoting Commonwealth v. Ferguson*, 444 Pa. 478, 282 A. 2d 378 (1971) ). "[T]he ultimate question is: did the defendant with full knowledge of his legal rights, knowingly and intentionally relinquish them?" *McZorn*, 288 N.C. at 434, 219 S.E. 2d at 212 (*quoting Miller v. U.S.*, 396 F. 2d 492, 496 (8th Cir. 1968), *cert. denied*, 393 U.S. 1031 (1969) ).

The Court in *McZorn* set forth five factors, among others, that should be analyzed as part of the totality of circumstances which determine whether the initial warnings have become so stale and so remote that there is a substantial possibility that the

individual was unaware of his constitutional rights at the time of the subsequent interrogation. These five factors are:

> (1) the length of time between the giving of the first warnings and the subsequent interrogation. *See State v. Gilreath*, 107 Ariz. 318, 487 P. 2d 385 (1971) (second and third interrogations occurred 12 and 36 hours respectively after the first; repeated warnings not required) (applying *Escobedo* principles); *Watson v. State*, 227 Ga. 698, 182 S.E. 2d 446 (1971) (7 hour interval held not to require repeated warning); *People v. Hill*, 39 Ill. 2d 125, 233 N.E. 2d 367 (1968); *Commonwealth v. Clark*, 454 Pa. 329, 311 A. 2d 910 (1973) (less than an hour); *Commonwealth v. Bennett*, 445 Pa. 8, 282 A. 2d 276 (1971) (five hours) (applying *Escobedo* principles); 12 Washington Law Journal 222, 226; (2) whether the warnings and the subsequent interrogation were given in the same or different places, *United States v. Hopkins*, 433 F. 2d 1041 (5th Cir. 1970); *Brown v. State*, 6 Md. App. 564, 252 A. 2d 272 (1969); (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, *Id.*; (4) the extent to which the subsequent statement differed from any previous statements; *Brown v. State, supra*; (5) the apparent intellectual and emotional state of the suspect. *State v. Magee*, 52 N.J. 352, 245 A. 2d 339 (1968), *cert. denied*, 393 U.S. 1097, 21 L.Ed. 2d 789, 89 S.Ct. 891 (1969).

*McZorn*, 288 N.C. at 434, 219 S.E. 2d at 212.

Applying the first and second *McZorn* factors to the facts of this case, the record shows that the length of time between the initial warning and interrogation and the second interrogation was very brief. The defendant's initial interview lasted about thirty to thirty-five minutes. At the end of this interview, the defendant was escorted a short distance to the booking area which was in the same building where the initial interrogation occurred. Upon reaching the booking area, the defendant volunteered, without prompting by Officer Hutcheson, information about the altercation with the deceased.

As to the third *McZorn* factor, the record clearly shows that Officer Hutcheson was present with Officer Jones at the defendant's initial interrogation. As to the fourth and fifth *McZorn* fac-

tors, it is clear from the record that the defendant's subsequent statement did not materially differ from his initial statement and that the record shows that the defendant appeared to be of sound mind and not under the influence of any alcohol or other drug when the second statement was made.

In applying the *McZorn* factors to this case, the totality of the circumstances suggests that the initial *Miranda* warnings were not so stale and remote as to create a substantial possibility that the defendant was unaware of his constitutional rights during the second interrogation. Application of the *McZorn* factors suggests that the defendant knowingly and freely relinquished his legal rights during the second interview. This assignment of error is overruled.

## V.

**[5]** The defendant's next assignment of error is that the trial court erred in failing to charge the jury as to involuntary manslaughter. At the charge conference, the trial court refused to charge the jury as to involuntary manslaughter as requested by the defendant. The defendant took exception to this refusal.

Involuntary manslaughter is the unlawful killing of a human being, unintentionally and without malice, proximately resulting from the commission of an unlawful act not amounting to a felony or resulting from some act done in an unlawful or culpably negligent manner, where fatal consequences were not improbable in light of the facts, or resulting from a culpably negligent omission to perform a legal duty. *State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981); *State v. Everhart*, 291 N.C. 700, 231 S.E. 2d 604 (1977). In this case, the defendant claims that evidence was presented which showed that the defendant did not intend to kill or inflict serious bodily injury on the deceased.

It is reversible error for the trial court to fail to instruct on a lesser offense when evidence has been introduced which supports the finding of such a lesser offense. Failure to instruct on the lesser crime is not cured by verdict finding the defendant guilty of the highest offense charged. *State v. Moore*, 275 N.C. 198, 166 S.E. 2d 652 (1969). However, the trial court is not required to charge the jury as to a lesser offense where no evidence has been submitted to support a verdict on this offense. *State v. Strick-*

*land*, 307 N.C. 274, 298 S.E. 2d 645 (1983); 4 Strong's N.C. Index 3d *Criminal Law* § 115 (1976). "Due process requires only that a lesser offense instruction be given if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *State v. Strickland*, 307 N.C. 274, 286, 298 S.E. 2d 645, 654 (1983) (quoting *Beck v. Alabama*, 447 U.S. 625, 635, 65 L.Ed. 2d 392, 401 (1980)).

In *State v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322 (1955) Justice (later Chief Justice) Bobbitt analyzed the intent requirement for involuntary manslaughter as follows:

> When the killing with a deadly weapon is admitted or established, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree. In *State v. Gregory*, 203 N.C. 528, 166 S.E. 387 (1932), where the defense was that an *accidental* discharge of the shotgun caused the death of the deceased, it was stated that the presumptions arise only when there is an *intentional killing* with a deadly weapon; and since the *Gregory* case it has been often stated that these presumptions arise only when there is an intentional killing with a deadly weapon. But the expression, *intentional killing*, is not used in the sense that a specific intent to kill must be admitted or established. The sense of the expression is that the presumptions arise when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted. [Citations omitted.] A specific intent to *kill*, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter. The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives rise to the presumptions. . . . The presumptions do not arise if an instrument, which is *per se* or may be a deadly weapon, is not intentionally used as a weapon, *e.g.*, from an accidental discharge of a shotgun.

*Gordon*, 241 N.C. at 358, 85 S.E. 2d at 323-24.

In this case, the defendant admits that he knowingly slashed and stabbed the deceased with a hunting knife. The defendant's

use of a knife indicates a clear intent to inflict great bodily harm or death on the deceased. There can be no claim of accidental injury where one knowingly and willingly uses a knife to slash and stab his victim. Fatal consequences were not improbable in light of the defendant's use of his hunting knife in such a manner. As such, the defendant's actions would not fit within the definition of involuntary manslaughter and therefore the defendant would not qualify for such an instruction. This assignment of error is overruled.

## VI.

[6] The defendant's next assignment of error is that the trial court should not have allowed the State to rebut the defendant's claim that the decedent was a "bad" person by arguing in its closing that the defendant had the opportunity to, but did not, introduce the decedent's criminal record into evidence.

In its closing argument, the State argued to the jury as follows:

> MR. LEONARD: He'll tell you that you can consider the apparent fairness of the witness, think about whether the witness exaggerated, whether that witness appeared to be fair. We saw Mr. Fisher for example go on the stand and say Mr. Hill there, Allen Hill must have assaulted 50 or 100 people. One thing you learn sittin' on a Jury and around Court saying something and showing something are two very different propositions. What do they have to support that? Where are those people, 50 or 100 people?
>
> MR. POWELL: Objection.
>
> THE COURT: Overruled.

Where are two or three of those people? They've got the same power to bring witnesses in that I do—

> MR. BLANCHARD: Objection.
>
> THE COURT: Overruled.

He says that Allen Hill was a bad, bad man. If he's such a bad individual, where is the record of criminal convictions?

> MR. BLANCHARD: Objection.

THE COURT: Overruled.

They had the opportunity to bring evidence up here from downstairs just like I did—

MR. BLANCHARD: Objection.

THE COURT: Overruled.

Where is any evidence of any criminal conviction?

MR. BLANCHARD: Objection.

THE COURT: Overruled.

And Mr. Powell sat here and talked at length about what a bad man he was. What a terrible man. How many bad people are there in Transylvania County beat up people going down the street, he beat up on 50 or 100 people including law enforcement officers and they can't bring you a case file or evidence up here to show you—

MR. BLANCHARD: Objection.

THE COURT: Overruled.

—that he's even been convicted of simple assault. That's what I mean by the apparent fairness of it all. There's a difference between saying something and proving it. You can stand up here as a lawyer or you can go up here on the witness stand as a witness and say anything you want to in the Superior Court of Transylvania County but I say prove it, let's have some hard evidence. You can consider a person's criminal record. If you are called on to believe somebody in some important decision in your day to day affairs one of the things you would probably want to know about that person would be what kind of criminal record do they have; what have they been convicted of. . . .

The defendant claims that the exchange set forth above was intended to, and did, leave the jury with the impression that the defendant could have introduced evidence of the deceased's criminal conviction record to the same extent that the State introduced evidence of the defendant's conviction record. The defendant relies on the case of *State v. Corn,* 307 N.C. 79, 296 S.E. 2d 261 (1982) in which this Court held that conviction records

of the deceased were not admissible for the purpose of establishing the deceased's reputation for violence or for the purpose of showing what the defendant knew about the deceased's violent behavior.

Although it is not cited in either the brief for the defendant or the brief for the State, it appears that the case of *State v. Burgess*, 76 N.C. App. 534, 333 S.E. 2d 563 (1985) directly addresses the issue of whether the State may argue in closing that the defendant could have, but did not, present evidence that the deceased had been convicted of any crime or crimes which would tend to show that he was a mean and violent person. We agree with *Burgess* where the North Carolina Court of Appeals, citing *Corn*, held that the trial court erred by allowing the State, in its closing argument, to bring to the jury's attention the fact that there was no evidence that the deceased had a criminal record. Having determined that it was improper to allow the State to argue that the defendant had not introduced evidence of the deceased's criminal record, the court next addressed the issue of whether such error was prejudicial.

Under N.C.G.S. § 15-1443 a defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that had the error in question not been committed, a different result would have been reached. In *Burgess*, the Court of Appeals held that since self-defense was the defendant's only defense in the case and the defendant attempted to prove self-defense by showing that the deceased was a violent and mean person, there was a reasonable possibility that the State's closing argument concerning the failure of the defendant to show the deceased's criminal conviction record caused the jury to discount the defendant's claim of self-defense. *Burgess*, 76 N.C. App. 534 at 536, 333 S.E. 2d 563 at 564.

The case *sub judice* differs from *Corn* and *Burgess* in that substantial evidence was admitted which tended to show that the victim had served time in prison and had a reputation for violence. Specifically the victim's mother, as well as several other witnesses, testified that the victim had served an active prison sentence. Further evidence showed that the victim had spent approximately five years in jail. Lastly, several witnesses testified as to the victim's violent character.

Although the district attorney's assertion during his closing argument that the defendant could have introduced the victim's criminal record is arguably wrong and misleading, it would not be *reversible* error due to the substantial evidence presented which showed that the victim did in fact have a criminal record and had served an active prison sentence. Additionally, other evidence was introduced which showed that the victim had a reputation for violence. In light of these factors, we find that the defendant was not prejudiced to such a degree as to constitute reversible error. This assignment of error is overruled.

## VII.

[7] The defendant next assigns as error the trial court's allowance of questions about the defendant's criminal record by referring to specific cases in which the defendant was not involved. Specifically, the defendant was asked if he was convicted of breaking and entering and larceny in early 1976. The defendant responded that he did not remember being convicted of either crime. The defendant's counsel moved for a mistrial based on the contention that these cases were juvenile offenses which were inadmissible. After hearing arguments made outside of the jury's presence, the trial court denied the defendant's motion for a mistrial.

After the trial, the defendant's new counsel determined that the defendant had not been involved in the two crimes objected to as juvenile offenses, and therefore these crimes were not a part of the defendant's record, juvenile or adult. As such the defendant's new counsel contends that admission of those crimes constitutes reversible error.

It is admitted that when a criminal defendant takes the stand in his own defense he puts his character in issue, thereby allowing the State to cross examine him as to his criminal record, if any. *State v. McKenna*, 289 N.C. 688, 224 S.E. 2d 537 (1976). Further, it is clear that for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime punishable by more than 60 days' confinement shall be admitted if elicited or established by public record during cross examination or thereafter, as long as no more than 10 years have elapsed since the date of conviction or release from confinement imposed as a result of the conviction, whichever is later. N.C.G.S.

§ 8C R. 609. However, the issue here is not whether the defendant's criminal record is admissible but whether the admission of the two cases in which the defendant was not involved constitutes sufficient error to justify a mistrial.

As discussed above, a decision by the trial court to grant or deny a mistrial will not be disturbed absent a showing of abuse of discretion. *State v. Primes,* 314 N.C. 202, 215, 333 S.E. 2d 278, 286 (1985). Additionally, it is clear that questions asked by the prosecutor will be considered proper unless the record shows that they were asked in bad faith. *State v. Dawson,* 302 N.C. 581, 586, 276 S.E. 2d 348, 352 (1981). In this case the record clearly shows that the State was not aware that two of the cases which it used in cross examining the defendant were not part of his criminal record, juvenile or adult.

MR. LEONARD: The State Court of Appeals in *State vs. Johnson* said; however, that Juvenile adjudication can be used if the accused takes the stand and can be used for the purpose of impeachment. So that was the reason I asked that and I don't know and still don't know if these were, in fact, juvenile adjudications. If they are, in fact, I have no reason to know. There's one thing that causes me to think they are not juvenile adjudications is that I went to—I went down to the Clerk's office this morning and I don't have those particular files I took notes on but I asked the Clerk to retrieve those two case numbers for me and she went to the regular Court files and pulled them out. She didn't go to the juvenile file, so they didn't appear to be juvenile adjudications to me and I do not think that they are.

MR. BLANCHARD: Your Honor, I will say other than the defendant is what he just read. He asked him how old he was. In fact what he did was ask him his birth date and if one does somewhat simple math, one will find they are juvenile records.

MR. LEONARD: Well, let me state if I may, sir. I'll give you the particular case numbers so that anyone can go make a request and see if they are taken from the adult file in cases numbers 76-464 and 465. I think those are the one's they're referring to, the breaking and entering and larceny.

MR. BLANCHARD: Early in 1976.

MR. LEONARD: 76-464, 76-465, 76-1645, 1763, 1734, 1760 and 1763, I have already mentioned that one. Those are all in the adult record.

It is apparent that the district attorney made a good faith effort to examine the record before using the evidence at trial. The record also shows that the district attorney offered the defense attorney the opportunity to check the defendant's record before going any further. Lastly, even if admission of the two crimes constitutes error, it would not rise to the level of reversible error, as it was not prejudicial to such a degree as to influence the jury's verdict. For these reasons, this assignment of error is overruled.

## VIII.

[8] Lastly, defendant contends that his constitutional right to adequate and effective trial counsel was violated in contravention of the Sixth Amendment. Specifically the defendant argues that his counsel's admission of malice during closing arguments was without the defendant's consent. The defendant claims that by admitting malice, his counsel precluded the jury from finding manslaughter and limited their potential verdicts to first or second-degree murder or not guilty.

The standard for determining whether counsel's representation of a criminal defendant was so deficient as to violate the defendant's Sixth Amendment rights was set forth in *Strickland v. Washington,* 466 U.S. 668, 80 L.Ed. 2d 674 (1984). Under the *Strickland* test:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sen-

tence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 80 L.Ed. 2d at 693.

The Supreme Court of North Carolina expressly adopted the *Strickland* test as the uniform standard to be applied when determining whether assistance of counsel was ineffective under the North Carolina Constitution. *State v. Braswell*, 312 N.C. 553, 324 S.E. 2d 241 (1985). In *Braswell*, the Court noted that the test for prejudice as set forth in *Strickland* fully comports with the statutory test for prejudice under N.C.G.S. § 15A-1443(a). *Braswell*, 312 N.C. at 562, 324 S.E. 2d at 248.

Under the *Strickland* test the proper standard for judging an attorney's performance is one of reasonably effective assistance, considering all of the circumstances. *Strickland*, 466 U.S. at 688, 80 L.Ed. 2d at 693. The defendant must show that his counsel's representation fell below an objective standard of reasonableness as defined by professional norms. *Strickland*, 466 U.S. at 688, 80 L.Ed. 2d at 693. Judicial review of counsel's performance must be highly deferential so as to avoid the prejudicial effects of hindsight. *Strickland*, 466 U.S. at 689, 80 L.Ed. 2d at 694. Because of the difficulties inherent in determining if counsel's conduct was within reasonable standards, a court must indulge a strong presumption that counsel's conduct falls within the broad range of what is reasonable assistance. *Strickland*, 466 U.S. at 689, 80 L.Ed. 2d at 694.

The defendant contends that his counsel's actions in admitting malice without his consent is *per se* a violation of his Sixth Amendment rights. In support of this position the defendant cites *State v. Harbison*, 315 N.C. 175, 337 S.E. 2d 504 (1985). In *Harbison*, this Court held that ineffective assistance of counsel is established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without his consent. *Harbison*, 315 N.C. at 180, 337 S.E. 2d at 507-08. In *Harbison*, the defense counsel argued, without authorization by the defendant, that the defendant was definitely guilty of manslaughter but not of first-degree murder.

The case *sub judice* is factually distinguishable from *Harbison* in that the defendant's counsel never clearly admitted guilt. The defendant's counsel argued to the jury that:

His Honor is going to submit to you a verdict form— Madam Clerk, do we have it drawn up yet? Thank you. In which its going to say, Ladies and Gentlemen of the Jury, Do you find the defendant guilty of murder in the first degree and then down below that it's going to say Do you find him guilty of second degree. Second degree is the unlawful killing of a human being with no premeditation and no deliberation but with malice, illwill. You heard Johnny testify, there was malice there and then another possible verdict is going to say Do you find him guilty of voluntary manslaughter. Voluntary manslaughter is the killing of a human being without malice and without premeditation. It's a killing. And it also has not guilty, remember that too. I asked you about that and it's not a not guilty as in some trial I wasn't there, I don't know a darn thing about it, I wasn't there, never been to Silversteen, never will go there. There are some that say, some defenses that say not guilty, that I was there. It's stupid to be there, it don't make mama proud of being there but I was there.

Although counsel stated there was malice, he did not admit guilt, as he told the jury that they could find the defendant not guilty. As this case does not fall with the *Harbison* line of cases where violation of the defendant's Sixth Amendment rights are presumed, the defendant's claim of ineffective assistance of counsel must be analyzed using the *Strickland* factors.

Under the *Strickland* test the defendant must first show that counsel's performance was deficient. Deficient is defined as evidence that counsel made errors so serious as to support a finding that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687, 80 L.Ed. 2d at 693. In reviewing defense counsel's conduct it is apparent that several tactical errors were made during the trial. These errors include his objections to the State's offer to introduce the victim's criminal record as well as the admission of malice in his closing argument. However, in applying the highly deferential standard of review required by *Strickland*, we find that counsel's conduct was not so deficient as to violate an objective standard of reasonableness.

Even if counsel's errors are presumed to be serious enough to raise doubt as to whether he was acting as "counsel" within the meaning of the Sixth Amendment, we find that the defendant has failed to satisfy the second prong of the *Strickland* test. Under the second prong of the *Strickland* test, the defendant must show that counsel's deficient performance prejudiced the defense to such a degree that a fair trial was not possible. That is, the defendant must show that there is a reasonable probability that, but for counsel's errors, there would have been a different result. *Strickland*, 466 U.S. at 687, 80 L.Ed. 2d at 693. After a careful review of the record we find that even if defense counsel's conduct is held to be professionally deficient, these errors did not result in prejudice sufficient to satisfy the reasonable probability standard that absent the errors a different verdict would have been handed down.

As we find that defense counsel's conduct was not deficient and that any errors that may have been committed were not prejudicial enough to call into doubt the outcome and fairness of the trial, we overrule the defendant's assignment of error.

No error.