**UNITED STATES of America, Plaintiff**

v.

**Elkin MELENDEZ SANTIAGO, Defendant.**

**Case No. 05–302 (DRD).**

United States District Court, D. Puerto Rico.

July 20, 2007.

Jorge L. Armenteros–Chervoni, Luis R. Rivera–Rodriguez, Luis Rafael Rivera Law Office, San Juan, PR, for Defendant.

Ernesto G. Lopez–Soltero, United States Attorney's Office, San Juan, PR, for Plaintiff.

### AMENDED OPINION AND ORDER

DANIEL R. DOMINGUEZ, District Judge.

## I. FACTUAL BACKGROUND

Pending before the Court is defendant, Elkin Melendez Santiago's *Motion to Suppress* (Docket No. 73) and plaintiff, the United States of America's *Sealed Motion in Opposition* (Docket No. 84). On February 27, 2007 and April 10, 2007, the Court held suppression hearings pertaining to said aforementioned motions. Thereafter, on April 16, 2007 the United States filed its *Brief Regarding the Evidentiary Hearing on Defendant's Motion to Suppress Statements* (Docket No. 273) and on May 3, 2007 the defendant, Elkin Melendez Santiago, filed a *Rebuttal of Government's Motion Regarding Admissibility of Statements of Defendant Melendez Santiago* (Docket No. 285).

The United States avers that FBI agents do not have to re-advise the Defendant of his *Miranda* rights once the Defendant has intelligently waived them. Pursuant to *United States v. Marenghi,* 109 F.3d 28, 31–32 (1st Cir.1997), the United States avers that "[w]hen law enforcement officials do not deliberately engage in coercive or improper tactics in obtaining an initial statement, but rather fail to advise a defendant of his or her *Miranda* warnings, a court's task in determining the admissibility of a subsequent statement is relatively straight forward." In order for a statement to be admissible under said scenario, the Defendant must have been "(1) advised of his or her *Miranda* rights; and (2) knowingly and voluntarily waive those rights." *See Id.* The United States alleges that in the instant case, the state-

ments provided by the Defendant were provided after he was advised of his *Miranda* rights and knowingly and voluntarily waived them. Notwithstanding said fact, the United States contends that the Defendant instead of insisting that his statements were coerced or provided without his knowledge, the Defendant testified that he never gave such statements to the agents. Therefore, the United States avers that the matter has became a credibility issue. Moreover, the United States contends that although it has been decided that there is no requirement that an accused be continually reminded of his *Miranda* rights, it has also been decided that once their rights are given, they may become stale at one point or another. Notwithstanding, although there is no fixed time-frame set by the First Circuit or the Supreme Court, as to when the *Miranda* warnings might become stale, the United States avers that a delay of 24 hours does not render the *Miranda* warnings stale. In conclusion, the United States alleges that since the Defendant's initial and subsequent statements were voluntarily and knowingly made, they should be admitted. Furthermore, the United States contends that not only have they met their burden of proof in proving the admissibility of Defendant's statements, but the Defendant has failed to support the claim that his constitutional rights were violated and therefore his alleged statements should be suppressed. For said reasons, the United States requests the Court to DENY Defendant's *Motion for Suppression* (Docket No. 73).

On the other hand, the Defendant contends through counsel that the statements that he allegedly made should be suppressed under several legal grounds. First, the Defendant states that the facts stated by the agents are not only "preposterous" but they are contradicted by docu-

mental evidence. Defendant avers that not only does agent Berrios allege that the initial appearance took place after lunch, instead of 11:50 a.m., as stated in the pretrial services officer's notes, but his testimony could not be corroborated because he failed to take notes during such an important investigation. Furthermore, Defendant avers that although he was at the DEA facilities with all the necessary equipment in order to record, tape, or adopt the Defendants admissions, the agents failed to record, tape or sign the alleged statements. Moreover, the Defendant contends that if the Court decides not to believe Defendant's version of the facts, then the Court should be compelled to suppress the alleged statements, given the Constitutional 6th Amendment violation. Defendant alleges that since the alleged statements and intent to cooperate, materialized after Defendant's initial appearance, the Defendant needed a lawyer. Defendant further contends that being the initial appearance a critical stage of the proceedings, a lawyer should be appointed for the Defendant. Notwithstanding said fact, the Defendant alleges that his request for an attorney went unheeded. For said reason, the Defendant avers that the agents violated his Constitutional right to counsel by failing to provide representation after the Defendant had requested the same and by the FBI agents continuing to question the Defendant and engage in conversation directly related to the instant case. Therefore, Defendant requests the Court to GRANT the pending *Motion to Suppress* (Docket No. 73).

## II. APPLICABLE LAW

### A. MIRANDA WARNINGS

It has been well established that *Miranda* warnings must be communicated to a suspect before he is subjected to "custodial interrogation". *U.S. v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996). In other words, "[u]nder *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), evidence obtained as a result of police interrogation prior to the defendant being read his '*Miranda* rights' cannot generally be used against the defendant in the prosecution's case in chief." *See U.S. v. Materas*, 483 F.3d 27, 32 (1st Cir.2007)(*emphasis ours*). "The Court in *Miranda* noted that the term 'custodial interrogation' signified 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *See Locke v. Cattell*, 476 F.3d 46, 51 (1st Cir.2007)(*quoting Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). The "custodial interrogation" inquiry necessary demands the determination of its two subsidiary components: 1) custody, and 2) interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 2398, 110 L.Ed.2d 243 (1990)(standing for the proposition that "[i]t is *Miranda*'s premise that the danger of coercion results from the interaction of custody and official interrogation")(*emphasis ours*). The custody determination is the initial, and generally, the central inquiry: it is the touchstone to the need for *Miranda* warnings. *See U.S. v. Quinn*, 815 F.2d 153, 160 (1st Cir.1987). The ultimate determination as to custody is "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See Thompson v. Keohane*, 516 U.S. 99, 100, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995)(*quoting California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983))(*internal quotations omitted*). In order to ascertain said ultimate determination, there are two essential inquires that need to be assessed. *See Id.*

The first inquiry—i.e., what circumstances surrounded the interrogation-is distinctly factual and state-court findings in response to that inquiry attract a presumption of correctness under § 2254(d). The second inquiry—i.e., would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave-calls for application of the controlling legal standard to the historical facts and thus presents a "mixed question of law and fact" qualifying for independent review. See Id.

The second component of "custodial interrogation" is, of course, the interrogation. Interrogation refers to both express questioning and its "functional equivalent", which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect". See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Again the inquiry is objective: how would the officer's statements and conduct be perceived by a reasonable person in the same circumstances? See U.S. v. Taylor, 985 F.2d 3, 7 (1st Cir.1993). The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. See Rhode Island, 446 U.S. at 301, 100 S.Ct. 1682.

On the other hand, case law authority has created a well known exception to the Miranda rule for "routine booking interrogation", involving questions related to the suspect's name, address and related matters. See U.S. v. Disla, 805 F.2d 1340, 1347 (9th Cir.1986). The case law has held that these questions, even when asked for arrest, rarely elicit incriminating responses because they serve an administrative need. See U.S. ex rel. Hines v. La Vallee, 521 F.2d 1109, 1112 (2nd Cir. 1975)(cert. denied sub nom.). However, this exception does not apply when the law enforcement officer, under the camouflage of asking background information, seeks information that may incriminate. See U.S. v. Mata–Abundiz, 717 F.2d 1277, 1280 (9th Cir.1983).

Furthermore, the First Circuit Court of Appeals has stated that

When law enforcement officials do not deliberately engage in coercive or improper tactics in obtaining an initial statement, but rather only fail to advise a defendant of his or her Miranda warnings, a court's task in determining the admissibility of a subsequent statement is relatively straightforward. Such a statement is admissible if it was obtained after the defendant: (1) was advised of his or her Miranda rights; and, (2) knowingly and voluntarily waived those rights. See Oregon v. Elstad, 470 U.S. 298, 318, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985); Bryant v. Vose, 785 F.2d 364, 366–67 (1st Cir.), cert. denied, 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986). This standard reflects the belief that "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." Oregon v. Elstad, 470 U.S. at 312, 105 S.Ct. at 1294–95. "In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or

invoke [his or her] rights." *Id.* at 314, 105 S.Ct. at 1296.

*See Marenghi,* 109 F.3d at 31–32 (1st Cir.1997)(*emphasis on original* ).

## B. SIXTH AMENDMENT RIGHT TO COUNSEL

"Pursuant to the Sixth Amendment, 'a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *See U.S. v. Leon–Delfis,* 203 F.3d 103, 110 (1st Cir.2000)(*quoting Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). Notwithstanding the fact that the Sixth Amendment right to counsel comes into existence at or after the time that judicial proceedings have been initiated against a Defendant, the same has to be exercised by the Defendant in order for it to be violated. *See Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). In other words, if a Defendant requests the assistance of a lawyer, it is at that instance that "the authorities' interview with him would have [to be] stopped, and further questioning would … be forbidden (*unless petitioner called for such a meeting* )." *See Id.,* (*emphasis ours* ); *see also Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)

("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights …., *unless the accused himself initiates further communication, exchanges, or conversations with the police.*")

(*Emphasis ours* ); *see also Patterson,* 487 U.S. at 291, 108 S.Ct. 2389

(Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny-not barring an accused from making an initial election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. *If an accused "knowingly and intelligently" pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial.*)

(*Emphasis ours* ); *see also Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (The Supreme Court stated that although the decision in *Edwards v. Arizona* was based on the Fifth Amendment right, "the reasoning of that case applies with even greater force to [Sixth Amendment right] cases.")(*Emphasis ours* ).

Furthermore, the Supreme Court of the United States has held that a Defendant's Sixth Amendment right to counsel is violated when the evidence used against him during trial consists "of his own incriminating words, which federal agents had *deliberately elicited* from him after he had been indicted and in the absence of his counsel." *See Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)(*emphasis ours* ); *see also Fellers v. U.S.,* 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004). Although "[t]he government has the burden to 'prove an intentional relinquishment or abandonment' of the Sixth Amendment right to counsel", e.g. *Leon–Delfis,* 203 F.3d at 110 (*emphasis ours* )(*quoting Brewer,* 430 U.S. at 404, 97 S.Ct. 1232), "[t]he Court has stated that we should indulge every reasonable presumption against waiver of fundamental constitutional rights." *See Id.* (*emphasis*

*ours* )(*quoting Michigan,* 475 U.S. at 633, 106 S.Ct. 1404)(*internal citation omitted* ). " 'The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *See Id.* (*quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

### III. ANALYSIS

■ After reviewing the pending motions and briefs, the Court has concluded that the first issues the Court must tackle are credibility issues. In other words, before the Court decides whether or not the agents were required to re-advise the Defendant of his *Miranda* Rights and whether or not Defendant's Constitutional right to an attorney was violated, the Court must decide if in fact the Defendant voluntarily and intelligently stated that he wished to cooperate and therefore provided the alleged admissions and whether or not he requested the presence of an attorney.

The United States contends that after the Defendant was arrested on September 13, 2005 and taken to the Federal Building, he voluntarily stated to the agents that he wished to cooperate. For said reason, the Defendant was briefly briefed before the initial appearance with Magistrate Judge Justo Arenas. Afterwards he was briefed at a hotel, then the next day at the Federal Building and then again at the Federal Building next to the prison. Furthermore, the United States alleges that the Defendant at no point during the two days that he was under the custody of the FBI did he request to have an attorney present. Moreover, the United States avers that although the Defendant alleges that during the first day of his debriefing,

that is September 13, 2005, he was under the influence of both cocaine and alcohol, he distinctly remembers that he was never debriefed by any law enforcement personnel nor did he ever speak with any FBI agent.

On the other hand, the Defendant contends that although after his arrest, he was taken to the Federal Building for pretrial when he initially agreed to cooperate and then for the initial appearance before the Magistrate Judge, then to a hotel and back to two Federal Buildings, he never gave any statements to any of the agents nor did he sign any document containing the alleged admissions. Furthermore, the Defendant contends that the statements allegedly made by him were never made as portrayed by the agents. On the contrary, the Defendant avers that he told the agents to take him to prison and that if they thought what they were saying was true then they should include it in their notes. Moreover, the Defendant contends that the statements the government portrays as admissions are simply responses given by a frightened individual who was "hijacked by armed federal agents who insisted that Mr. Melendez Santiago cooperate with them and would not take him to prison, where he thought he was going, until a day [and] a half later." *See* Docket No. 285, pg. 4 (*emphasis ours* ). The Defendant further avers that although he requested an attorney during the two days that he was under FBI custody, the agents failed to provide him with one.

On February 27, 2007, during the suppression hearing, agent Juan Berrios Silva testified under oath that defendant, Elkin Melendez was arrested on September 13, 2005 at around 5:10 a.m. *See Transcript of February 27, 2007,* pg. 5. After his arrest, Defendant was advised as to the charges against him, he was processed and read his rights. *See Id.,* at pg. 7–8. Agent Berrios

stated that before the Defendant signed a form containing the *Miranda* rights, he requested the part containing the waiver of rights to be crossed out due to the fact that he did not wish to waive them. *See Transcript of February 27, 2007,* pg. 9–12. Agent Berrios further testified that the Defendant was taken to pretrial services for an interview and that when he was returned to the processing room he voluntarily told the agents that he wished to cooperate. *See Id.,* at pg. 13–14. Consequently, agent Berrios stated that the Defendant was briefed for about an hour. *See Id.,* at pg. 18–19. That during the brief interrogation Agent Berrios' demeanor towards the Defendant was "[v]ery friendly, very entrusting, very open", he was never untruthful nor did he play any tricks. *See Id.,* at pg. 20. Agent Berrios further stated that the Defendant did not appear anxious, on the other hand he seemed "at ease, very open and trusting" as well as comfortable. *See Id.,* at pg. 21. After he was briefly briefed the Defendant was kept in another room apart from other detainees, until 1:30 p.m. *See Id.,* at pg. 20–21. At that time, the Defendant was taken before Magistrate Judge Justo Arenas for the initial appearance. *See Id.,* at pg. 21. (While the Defendant was before a United States Magistrate Judge he failed to state to the Judge that he had been questioned by Federal agents against his will.) Agent Berrios further testified that since the Defendant had stated that he wanted to cooperate, the Magistrate Judge re-read him his rights and left him under the custody of the FBI. *See Id.* Agent Berrios stated that it was A.U.S. Attorney Ernesto Lopez who informed the Magistrate Judge of the fact that the Defendant wished to cooperate. *See Id.* (Most probably A.U.S. Attorney Ernesto Lopez informed said fact to the Magistrate Judge at a side bar since said type of cooperation is rarely stated for the record in public).

Furthermore, agent Berrios stated that at no point did the Defendant request an attorney, even after the Magistrate Judge advised him that he had a right to consult one. *See Id.,* at pg. 21–22. After the initial appearance, agent Berrios testified that they took the Defendant to a hotel in the metropolitan area pursuant to the fact that the Defendant had stated that he wished to cooperate and the agents wanted him to feel comfortable with them. *See Id.,* at pg. 24. At the hotel, in order to cooperate with the agents, the Defendant made a few phone calls. *See Id.,* at pg. 25. Agent Berrios stated that the Defendant called a person named Wally (co-cooperator) and was able to have a conversation with. *See Id.* Furthermore, agent Berrios stated that according to the Defendant, Wally already knew that the Defendant had been arrested. *See Id.,* at pg. 25. Although the Defendant called another person, known as Victor, he failed to answer the call. *See Id.* Agent Berrios testified that he left the hotel at around 6:00 p.m. *See Id.,* at pg. 26. Agent Berrios stated that regarding the debriefing that had been done on September 13, 2005, he prepared a 302 FBI Form. *See Id.,* at pg. 27. After leaving the hotel, the next time agent Berrios saw the Defendant was on September 14, 2005 at 7:00 a.m., in the Federal Building. *See Id.,* at pg. 26. That day agent Berrios, together with Officer Felix Rivera and his supervisor Mike Plichta took the Defendant to the GSA yard (Federal Building) where the Defendant was debriefed in a more in-depth manner. *See Id.,* at pg. 27. In regards to the Defendant's demeanor, agent Berrios stated that during the day of September 14, 2005 the Defendant appeared calm and very cooperative. *See Id.,* at pg. 28. Moreover, agent Berrios stated that the Defendant did not request an attorney, nor did he at an any time state that he did not desire to continue cooperating. *See Id.,* at

pg. 30. After the interview, agent Berrios stated that they consulted with A.U.S.A. Ernesto Lopez and he decided that Defendant was to be incarcerated, since the main target of Defendant's cooperation, Wally, already knew that the Defendant had been arrested. *See Id.* For said reason, the Defendant was taken to MDC (federal prison facility) on September 14, 2005. *See Id.*

After the testimony of agent Berrios, the defendant, Elkin Melendez Santiago, on April 10, 2007, testified his version of the facts. The Defendant testified under oath that he was arrested on September 13, 2005. *See Transcript of April 10, 2007,* pg. 14. Before he was arrested he was having a few drinks and sniffing approximately two to three grams of cocaine, which he does regularly three to four hours a day. *See Id.,* at pg. 15–16. For said reason, the Defendant stated that he felt "high, agitated, nervous, hyperactive." *See Id.,* at pg. 16. The Defendant further stated that around 5:00–5:30 a.m., about 50 agents came into his house with weapons and proceeded to arrest him and place him in an SUV. *See Id.,* at pg. 18. After being placed in the SUV, the Defendant stated that he was asked whether he was Elkin Melendez, also know as Caliche. *See Id.,* at pg. 19. The Defendant also stated that the agents proceeded to inform him of the mess that he was in and started pressuring him to cooperate. *See Id.,* at pg. 19. The Defendant testified that he was read his rights in the SUV on the way to the Court and that he never said to the agents that he wished to cooperate. *See Id.,* at pg. 19–20. On the other hand, the Defendant testified that he claimed his right to a lawyer at all times and that he specifically requested the presence of his own lawyer, Jenny Hoffman. *See Id.,* at pg. 20. The Defendant stated that when he requested his lawyer the agents told him that after he cooperated they would call his attorney.

*See Id.,* at pg. 21. Regarding the *Miranda* Warnings, the Defendant stated that although he was read his rights in the SUV, it was not until he arrived at the Federal Building that he actually read and signed a paper containing said warnings. *See Id.,* at pg. 23–24. The Defendant stated that although he did sign the paper he asked the agents to cross out the waiver of rights because he was demanding those rights. *See Id.,* at pg. 25–26. The Defendant testified that he was specifically demanding his right to counsel. *See Id.,* at pg. 26. Afterwards the Defendant stated that he was taken to pretrial where he was asked some questions, specifically whether he wanted an attorney, to which he answered that he did. *See Id.,* at pg. 26–27. The Defendant further stated that after he was explained his rights they took him out of Pretrial Services. *See Id.,* at pg. 27. Notwithstanding, the Defendant stated that at no point did he inform to pretrial officers that he wanted to cooperate nor did they inform him that the agents thought that he wanted to cooperate. *See Id.* After they took him out of pretrial, the Defendant stated that he was taken to a room with several agents and about three prisoners. *See Id.* The Defendant testified that of the three prisoners he only remembered two of them, Zulema and Guadalupe. *See Id.,* at pg. 27–28. During that time the Defendant stated that the agents asked him again whether or not he wished to cooperate, to which he replied that he didn't so desire. *See Id.,* at pg. 28. After the Defendant was taken out of the room, he stated that he was taken to another FBI room in the same building with about three or four agents. *See Transcript of April 10, 2007,* pg. 28–29. In said room, the Defendant stated that the agents were pressuring him to cooperate by saying that they were going to bring his wife and that they knew many criminal acts that he had

done and knew the people that he had worked with. *See Id.*, at pg. 29. The Defendant further stated that what he told the agents was "that if they knew everything, well, just to state that," and he reiterated that he wanted an attorney and to be incarcerated *See Id.* The Defendant then stated that when he was before Magistrate Judge he did not inform the Magistrate that he wanted to cooperate. *See Id.* In the Magistrate's court room, the Defendant was read his charges as well as his rights. *See Id.*, at pg. 30.

After the initial appearance before the Magistrate the Defendant stated that although he thought he was going to be taken to prison, he was taken to a hotel. *See Id.* At that point the Defendant testified that he felt scared because he though he was being kidnapped. *See Id.* At the hotel the Defendant stated that the agents wanted him to cooperate, make some calls and write down statements. *See Id.* Notwithstanding, the Defendant stated that he did not write any confession statements, or make any calls, nor did he sign any confession or any papers regarding any admissions. *See Id.*, at pg. 31. The Defendant stated that the agents insistence continued for about three to four hours and that at the end he felt scared because he thought that they were going to do something to him. *See Id.*, at pg. 31–32.

The next day, September 14, 2005, the Defendant stated that he was taken to the Federal Building into a federal room at around 6:00 or 7:00 a.m. *See Id.*, at pg. 32. After he was placed in the room, the Defendant stated that the FBI agents once again wanted him to confess everything that they already knew about him. *See Id.* Again the Defendant stated that he told the Agents to state whatever they were saying and to take him to jail. *See Id.*, at pg. 32–33. After the session in the Federal Building, the Defendant stated that al-

though he thought he was going to be taken to jail, he was taken to another room in front of the federal prison in Buchanan. *See Transcript of April 10, 2007*, pg. 34. In that room, the Defendant stated that the same conduct of the agents was reiterated, the agents wanted him to make statements, to make phone calls and told him that it would be better if he cooperated, if not his wife was going to have problems and that he was to be sentenced to life or 30 years. *See Id.*, at pg. 34. To that the Defendant stated that he told the agents the same response, "that if they knew all of that, for them to state so, that [he] just wanted to be taken to jail." *See Id.*, at pg. 35 (*emphasis ours*). The Defendant further stated that he again informed the agents that he wanted an attorney or to be taken to jail. *See Id.* After that the Defendant stated that he was taken to jail. *See Id.*

After the Defendant testified, special agent Felix Rivera was called to testify. Agent Rivera stated that although he interviewed the defendant, Elkin Melendez on September 14, 2005, he did see the Defendant on September 13, 2005 at the hotel. *See Id.*, at pg. 98. He stated that he went to the hotel after he was told by his supervisor, Michael Plichta, that the Defendant was cooperating with the agency and that he had been taken to a hotel so he could help the agency by making some phone calls and by being debriefed. *See Id.*, at pg. 98–101. Agent Rivera stated that when he arrived at the hotel room, which was early in the afternoon, he found the Defendant lying on the bed sleeping. *See Id.*, at pg. 101–102. He also stated that they waited until the Defendant woke up before he made several phone calls and was debriefed. *See Id.*, at pg. 102. Agent Rivera further stated that the Defendant did make some phone calls and that he specifically called Wally. *See Id.*, at pg. 103. Defendant stated that from what he

could gather, Wally already knew that the Defendant was already under custody so he didn't want to talk to the Defendant. *See Id.*, at pg. 104. Agent Rivera also stated that at no point during September 13, 2005, did the Defendant in front him state that he wanted a lawyer. *See Id.*, at pg. 104. Regarding the Defendant's state of mind, Agent Rivera stated that the Defendant was very relaxed. *See Id.*, at pg. 106.

The next day, September 14, 2005, Agent Rivera stated that he received a call from his supervisor, Michael Plichta telling him the Defendant was to be interviewed. *See Transcript of April 10, 2007*, pg. 108. Therefore, agent Rivera and agent Plichta went to the GSA building in Buchanan where they found the Defendant with other agents waiting for their arrival to start the interview. *See Id.* Agent Rivera further stated that he interviewed the Defendant and prepared an FBI 302 form, which is a recollection of the statements made by the Defendant during the interview. *See Id.*, at pg. 108–109. Agent Rivera stated that during the interview that day the Defendant appeared normal in demeanor and relaxed ("nice"), and that at no point did he seem agitated, sleepy or influenced by drugs or alcohol. *See Id.*, at pg. 112. Agent Rivera further stated that at no point during the interview did the Defendant request an attorney nor did he inform agent Rivera that he did not wish to cooperate or stop the interview. *See Id.*, at pg. 113. Agent Rivera stated that they did not treat the Defendant any differently than other Defendants, besides the fact that "he was put in a hotel room because he was cooperating with [them], and he was placed in another interview room the next day ... [where they] were interviewing him just like a cooperating witness." *See Id.* (*emphasis ours*). Agent Rivera stated that no other Defendant was provided a hotel. *See Id.*, at pg. 114. Agent

Rivera also stated that the Defendant was not made any promises about what the prosecutor would do nor was he made any misrepresentations. *See Id.*, at pg. 114–115. In regards to whether or not the Defendant appeared to have any mental or physical disabilities, agent Rivera stated that he had none. *See Id.*, at pg. 116.

After reviewing the aforementioned testimonial and documentary evidence, the Court has concluded that the record provides sufficient circumstantial evidence for the Court to award total credibility to the United States' version of the facts. The Court has found that agent Felix Rivera's testimony as well as agent Juan Berrios Silva's testimony, were totally credible and were corroborated with each others testimony even after being rigorously cross examined by counsel during the Suppression Hearings. *See* Docket No. 269. Furthermore, agent Berrios testified that at the initial appearance A.U.S.A. Ernesto Lopez informed Magistrate Judge Justo Arenas of the fact that the Defendant wished to cooperate. Moreover, the Court has found that since the Defendant, unlike other Defendants, was left under FBI custody and taken to a hotel to be debriefed, instead of being taken directly to jail after his initial appearance, gives the Court reason to believe that he was in fact cooperating with the agents. Regarding whether or not the Defendant requested an attorney, the record shows that agent Felix Rivera and agent Juan Berrios Silva both testified under oath that at no point during the two days that the Defendant was under FBI custody, did he request the assistance of counsel. Furthermore, agent Berrios testified that not only did the Defendant fail to request a lawyer at any point, but he failed to do so even after Magistrate Judge Justo Arenas advised him that he had a right to consult one. Pursuant to the agents testimonies, at the

time of the initial appearance before the Magistrate Judge, the Defendant was already cooperating. Consequently, after weighing Plaintiff's and Defendant's versions of the facts, the Court has decided to afford total credibility to Plaintiff's version of the facts. Therefore, the Court has concluded that the Defendant informed the agents that he wished to cooperate (he expressly "called for such meeting" to cooperate, notwithstanding that prior thereto he stated that he did not wish to wave his rights.), and that he provided the alleged admissions during cooperation. Regarding whether or not the Defendant requested the presence of an attorney, although the Court affords total credibility to the United States' version of the facts, which state that the Defendant failed to request an attorney, the Court has found that even if the Defendant had "expressed his desire to deal with the police only through counsel", and consequently "not [be] subject to further interrogation by the authorities", the confession is still admissible if he "himself initiates further communication" with the authorities. *See Patterson*, 487 U.S. at 291, 108 S.Ct. 2389 (*quoting Edwards*, 451 U.S. at 484–485, 101 S.Ct. 1880); (*emphasis on original and internal citations omitted*).

Taking into consideration the version of the facts as presented by the United States, the Court deems necessary to discuss the following issues. First, the Court has found that even though at the beginning the Defendant stated that he was not willing to waive his rights, the fact that after pretrial services he voluntarily initiated a conversation with the agents regarding the facts of the case, shows that he voluntarily and intelligently waived his rights.[1] In a similar case, *U.S. v. Hopkins*, 433 F.2d 1041, 1044 (5th Cir.1970), the Circuit Court of Appeals stated the following:

> The undisputed facts reveal that after [the Defendant] refused to sign the waiver, [the agent] indeed attempted to terminate the interrogation. It was [the Defendant] who initiated the subsequent conversation by insisting that he 'didn't steal the car in the first place.' While *Miranda* places upon the Government a heavy burden both with regard to inculpatory and exculpatory remarks 'to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel,' 384 U.S. at 475, 86 S.Ct. at 1628, we feel this burden has here been clearly met. There is no evidence that [the agent] persisted in interrogating [the Defendant] despite his refusal to waive his constitutional rights. Nor is there evidence that [the Defendant] manifested inconsistent conduct because of confusion. *See United States v. Nielsen*, 7 Cir. 1968, 392 F.2d 849. ***Rather, the***

---

1. Although the Defendant alleges that he was feeling "high, agitated, nervous [and] hyperactive", because of the alcohol and cocaine he had consumed the night before he was arrested, Agent Berrios testified that the Defendant did not appear anxious while he was talking to him. *See Transcript of April 10, 2007*, at pg. 16, (*emphasis ours*). On the other hand, agent Berrios stated that he seemed "at ease, very open and trusting" as well as comfortable. *See Transcript of February 27, 2007*, at pg. 21. Furthermore, agent Rivera testified that at the hotel, on September 13, 2004, after the initial appearance before the Magistrate Judge, the Defendant's state of mind was very relaxed. *See Transcript of April 10, 2007*, at pg. 106. Moreover, agent Rivera stated that while he was interviewing the Defendant on September 14, 2004, the Defendant appeared "normal and nice" and that at no point did he seem agitated, sleepy or influenced by drugs or alcohol. *See Id.*, at pg. 112. Regarding whether or not the Defendant appeared to have any mental or physical disabilities, agent Rivera stated that he had none. *See Id.*, at pg. 116.

*record shows that [the Defendant], after refusing to waive his rights and upon seeing [the agent] get up to leave, initiated the ensuing conversation in order to exculpate himself.*
(*Emphasis ours*); *see also U.S. v. Thompson,* 417 F.2d 196, 197 (4th Cir.1969) cert. denied, 396 U.S. 1047, 90 S.Ct. 699, 24 L.Ed.2d 692 (1970).

Since in the instant case, Defendant voluntarily started a conversation with the agents that accompanied him after he was brought back from pretrial services and voluntarily informed them that he wished to cooperate, is sufficient evidence for the Court to conclude that "the defendant knowingly and intelligently waived his privilege against self-incrimination ...". *See Hopkins,* 433 F.2d at 1044 (*internal citations omitted*).

Second, the Court has found that although the Sixth Amendment right to counsel comes into existence at or after the time that judicial proceedings have been initiated against a Defendant, the same has to be exercised by the Defendant in order for it to be violated. *See Patterson,* 487 U.S. at 290–291, 108 S.Ct. 2389. In other words, if a Defendant requests the assistance of a lawyer, it is at that instance that "the authorities' interview with him would have [to be] stopped, and further questioning would ... be forbidden (*unless petitioner called for such a meeting*)." *See Id.* (*emphasis ours*); *see also Edwards,* 451 U.S. at 484–485, 101 S.Ct. 1880. The Court is satisfied that the Government met its burden of proving that the Defendant intentionally abandoned his Sixth Amendment right to counsel, notwithstanding having been provided his rights. *See Leon–Delfis,* 203 F.3d at 110.

■ Third, the Court has concluded that the FBI agents were not required to re-advise the Defendant of his *Miranda* rights during the two days that he was under FBI custody. The Court explains. First of all, the Court notes that pursuant to the suppression hearing transcripts, the Defendant was informed of his *Miranda* rights after his arrest and then again when he arrived at the Federal Building. After being re-read his rights he was provided a form containing the *Miranda* rights in Spanish, which he proceeded to sign. Notwithstanding, before he singed the document, the agents crossed out the waiver of rights contained in the aforementioned document due to the fact that the Defendant was not willing to waive any of his rights. The Court further notes that at that point, the Defendant had already been advised of his *Miranda* rights at least twice and had signed a paper copy which provided the *Miranda* rights in Spanish. Nevertheless, after the Defendant was brought back from pretrial services, he voluntarily initiated a conversation with the agents informing them of his desire to cooperate. Moreover, agent Berrios further testified that when the Defendant was taken before Magistrate Judge Justo Arenas for the initial appearance, the Magistrate Judge also read him his rights. At that point, the Defendant had been read his rights for a third time since his arrest. Therefore, the Court finds that if there is an obligation which requires that a Defendant be re-advised of his *Miranda* rights after a certain amount of time, the same would have been thoroughly complied with in the instant case. Notwithstanding, the Court deems proper to state that several Courts have decided that there is no requirement to re-administer *Miranda* warnings to a Defendant *once he has intelligently waived them.* For example, the Fifth Circuit Court of Appeals has stated that

'there is no requirement that an accused be continually reminded of his rights *once he has intelligently waived*

*them.'* *United States v. Anthony,* 474 F.2d 770, 773 (5th Cir.1973). A great many courts, state and federal, have likewise held that repeated warnings are not necessary to a finding that a defendant, with full knowledge of his rights, knowingly and intelligently waived them. *United States v. Anthony,* 474 F.2d 770 (5th Cir.1973); *Miller v. United States,* 396 F.2d 492 (8th Cir.1968); *Maguire v. United States,* 396 F.2d 327 (9th Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969); *Gorman v. United States,* 380 F.2d 158 (1st Cir.1967); *United States v. Kinsey,* 352 F.Supp. 1176 (E.D.Pa.1972); *State v. Gallagher,* 36 Ohio App.2d 29, 301 N.E.2d 888 (1973); *Commonwealth v. Abrams,* 443 Pa. 295, 278 A.2d 902 (1971); *State v. Rowe,* 77 Wash.2d 955, 468 P.2d 1000 (1970); *State v. Blanchey,* 75 Wash.2d 926, 454 P.2d 841 (1969); *Brown v. State,* 6 Md.App. 564, 252 A.2d 272 (1969); *State v. Magee,* 52 N.J. 352, 245 A.2d 339 (1968); *People v. Hill,* 39 Ill.2d 125, 233 N.E.2d 367 (1968); *State v. Lucia,* 74 Wash.2d 819, 447 P.2d 606 (1968); *People v. Schenk,* 24 Cal.App.3d 233, 101 Cal.Rptr. 75 (1972); *People v. Brockman,* 2 Cal.App.3d 1002, 83 Cal. Rptr. 70 (Ct.App.1969).

*See Biddy v. Diamond,* 516 F.2d 118, 122 (5th Cir.1975) (*emphasis ours*); *see also Gorman v. U.S.,* 380 F.2d 158, 164 (1st Cir.1967)

("In the first place, advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda*. Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards 'to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it.' ")(*quoting Miranda v. State of Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)).

In the instant case, the Defendant not only understood the rights that were read to him but he was very aware of the fact that if he signed the waiver, he would be waiving his rights. Furthermore, the Court notes that since the Defendant understood his rights and stated that he did not wish to waive his rights at that moment, when the Defendant voluntarily initiated a conversation with the agents and informed them that he in fact wished to cooperate, *he was voluntarily and intelligently waiving his rights. See U.S. v. Eaton,* 890 F.2d 511, 515 (1st Cir.1989)

(Once an individual has invoked his Fifth Amendment rights, all police interrogation must cease. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966). Where the right to counsel is invoked, all questioning must cease immediately and no further questions may be asked until counsel is present, *unless the individual voluntarily and knowingly initiates renewed exchanges with the police.*)

*See also Biddy,* 516 F.2d at 122.

The Court notes that pursuant to Defendants own version of the facts, the cooperation (or forced questioning as alleged by the Defendant), allegedly occurred after the third *Miranda* warning was provided by the Magistrate Judge. Therefore, given the fact that the Defendant was advised of his *Miranda* rights three times during the day of his arrest as well as the fact that he voluntarily waived his rights by voluntarily initiating a conversation with the agents regarding the facts of the case, provides the Court with more than enough factual evidence to conclude that the agents were not required to continually remind the Defendant of the rights that he had voluntarily waived, throughout the two days that he was under FBI custody.

Notwithstanding the aforementioned analysis, "*Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity." *See Hopkins,* 433 F.2d at 1045. In *United States v. Hopkins* the Circuit Court of Appeals decided that "[t]here may be occasions where interrogation by one authority, be it state or federal, is so disconnected with interrogation by the other as to compel a reiteration of the *Miranda* warnings." 433 F.2d at 1045. Nevertheless, the aforementioned example is not applicable to the instant case since the record shows that the Defendant's only interaction during the two days was with federal agents as to the same subject matter. Moreover, the type of "interrogation" that is analyzed in *Hopkins* is the type of interrogation that is initiated by the authority, not the suspect. In the instant case, it was the Defendant who voluntarily initiated the conversation with the agents, after being dually advised of his *Miranda* rights. Furthermore, in *U.S. v. Eaton,* 890 F.2d at 515, the First Circuit Court of Appeals stated that "[o]nce an individual has invoked his Fifth Amendment rights," as well as "the right to counsel ... all questioning must cease immediately and no further questions may be asked until counsel is present, *unless the individual voluntarily and knowingly initiates renewed exchanges with the police.*" (*citing Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602; *Edwards,* 451 U.S. at 483–484, 101 S.Ct. 1880). Expressed in alternate terms, if the conversation is initiated by the suspect, the police is not required to re-administer the *Miranda* rights.

### IV. CONCLUSION

For the reasons stated above, the Court has concluded that the Defendant volun-

tarily and intelligently waived his rights when after being advised of his rights he voluntarily informed the agents that he wished to cooperate. Furthermore, the Court concludes that the Defendant's Six Amendment right to counsel was not violated due to the fact that after the Defendant was advised of his right to counsel, *he was the one who voluntarily initiated the conversation with the agents.* Additionally, although the agents were not required to re-administer *Miranda* warnings due to the fact that the Defendant had understood them, the Court has found that he voluntarily and intelligently waived them by initiating himself, conversations with the agents.

For the reasons stated above, the Defendant's *Motion to Suppress* (Docket No. 73) is hereby **DENIED.**[2]

**IT IS SO ORDERED.**

---

**2.** Notwithstanding, since the issues that have been entertained by the Court in this Opinion and Order, have been mostly credibility is-

sues, the Defendant may resubmit his *Motion to Suppress* (Docket No. 73), to the jury during trial if it is deemed necessary.