# United States Court of Appeals
## For the First Circuit

No. 08-2394

UNITED STATES OF AMERICA,

Appellee,

v.

ELKIN MELÉNDEZ-SANTIAGO, a/k/a CARLOS, a/k/a CALICHE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Jorge L. Armenteros-Chervoni, for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States
Attorney, were on brief, for appellee.

June 30, 2011

**LYNCH**, **Chief Judge**.  After a twenty-eight-day trial in 2007 a jury found Elkin Meléndez-Santiago, one of twelve indicted co-conspirators, guilty of conspiracy to import five or more kilograms of cocaine and one or more kilograms of heroin, as well as actual importation of five or more kilograms of cocaine, as part of a massive cocaine and heroin importation organization.  Only one other defendant went to trial and he was also convicted. The remainder pled guilty.

In the conspiracy, Meléndez provided cash to co-conspirators to cover expenses for some drug smuggling operations and purchased cocaine and heroin imported into Puerto Rico for further distribution.  Millions of dollars worth of drugs were imported.  During one importation attempt in 2004, federal officers who had been tipped off to the drugs' arrival seized the drugs after a shootout with some of Meléndez's co-conspirators.  The district court found it was known or foreseeable that firearms were being carried in furtherance of the conspiracy, justifying a sentence enhancement.

Meléndez was a cocaine addict who used cocaine daily, United States v. Melendez Santiago, 544 F. Supp. 2d 76, 83 (D.P.R. 2007) (Melendez II), but he had no prior criminal record.  He was sentenced to 360 months' imprisonment, which was less than the life sentence advised by the U.S. Sentencing Guidelines.

His appeal argues two points. First, he argues the district court committed reversible error in not suppressing evidence of conversations recorded in two Title III wiretaps because the affidavits in support of the wiretaps did not sufficiently explain why traditional investigative procedures were inadequate, necessitating wiretaps, see 18 U.S.C. § 2518(1)(c), (3)(c), and because the affidavits contained misleading information. He argues that the district court should have held a Franks hearing to permit him to establish that the affidavits included misleading information and that without such information, the affidavits would not have sufficed to establish probable cause for the wiretaps. See Franks v. Delaware, 438 U.S. 154, 155-56 (1978). Second, Meléndez argues the court erred in denying a second motion to suppress his own statements and confession to agents while in custody as involuntary under the Fifth Amendment or in violation of his Sixth Amendment right to counsel. The district court issued careful and helpful opinions on both motions. See Melendez II, 544 F. Supp. 2d 76 (denying motion to suppress statements); United States v. Melendez-Santiago, 447 F. Supp. 2d 144 (D.P.R. 2006) (Melendez I) (denying motion to suppress wiretap recordings). We reject Meléndez's arguments and affirm.

I. The Title III Wiretap

A.      Necessity

The initial determination as to compliance with the stringent standards for issuing a wiretap authorization, 18 U.S.C. § 2518(1), is made by the judge to whom the application is made. See United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003) (explaining standard and procedure for wiretap warrants). At this later stage, appellate review of that authorization is not de novo, but deferential. We "decide if the facts set forth in the application were minimally adequate to support the determination that was made." Id. (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)) (internal quotation marks omitted).

Here, two wiretap authorizations resulted from applications dated November 23 and December 9, 2004, both supported by sworn affidavits by FBI agent Jose Mena. Both applications targeted certain cell phone numbers and were approved by a district court judge. These cell phone numbers were used by the conspiracy leader, Luis Alfredo De La Rosa-Montero, also known as "Luis Viagra" or "El Compadre," to coordinate the drug conspiracy.

In order to be approved, the applications needed to show what is commonly referred to as the "necessity" of resort to wiretaps. United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006). To make this showing, wiretap applications must provide "a full and complete statement as to whether or not other

-4-

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c); see also id. § 2518(3)(c) (judge's duty to evaluate showing of necessity).  In United States v. Villarman-Oviedo, 325 F.3d 1 (1st Cir. 2003), we interpreted § 2518(1)(c) "to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.'"  Id. at 9 (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)).  In such a statement, "[i]t is not necessary . . . to show that other methods have been entirely unsuccessful."  Id.

Our reading of the affidavits disproves Meléndez's contentions that they were insufficient to support issuance of the wiretap authorizations.  Indeed, they were better than minimally adequate.  The November 23 affidavit contained the available identifying information known about the conspirators, all Dominican or Puerto Rican nationals.  The affidavit also described how three confidential sources and one confidential informant had at times aided the investigation, providing information about those who were working in the conspiracy and about particular prior shipments, information that had led to successful arrests and drug seizures.  The affidavit described in twenty-five detailed pages the conversations and interactions the sources and informant had with

-5-

De La Rosa, some of which were recorded by the sources and some of which were verified when transactions were interrupted and smugglers arrested by federal officials. The affidavit also described what information had been gleaned from existing pen register and trap and trace analysis of De La Rosa's phone numbers.

The November 23 affidavit also described the limited success of efforts to conduct physical surveillance of the conspiracy leader De La Rosa. Physical surveillance was especially difficult in St. Thomas, where De La Rosa lived, because the streets were narrow and foreigners easily spotted. De La Rosa and other conspirators stayed in areas frequented by other Dominican nationals who were part of the same criminal subculture. The conspirators were wary of surveillance and they, in fact, mounted vigilant counter-surveillance. The conspirators did not use their real names and distrusted others not like them. Federal agents either mounting surveillance or attempting to infiltrate the organization undercover who were not members of that subculture would be easily spotted, would not be trusted by other members of the conspiracy, and would consequently be at great risk. Importantly, at the time of the wiretap application, one of the confidential sources had been missing for five months and was presumed dead; another had been threatened with death and was no longer trusted by members of the organization.

The information from sources other than surveillance was also constrained. The affidavit explained why traditional investigative techniques that had not been used--a grand jury investigation, interviews with co-conspirators or their associates, or execution of search warrants--were, particularly given the limited information known about the co-conspirators' identities and roles, likely to tip off the co-conspirators as to the developing investigation without yielding much helpful information. Pen registers and trap and trace records were already being used and would continue to be used, but gleaned only limited information about the cell phones being used.

The December 9 application sought wiretap authorization for another, new cell phone number used by De La Rosa. The supporting affidavit was similar in its level of detail to the first, related affidavit.

The affidavits' exhaustive explanation of what facts were known, what details remained unknown, what investigative techniques had been used and what techniques were likely to be unhelpful in the specific context of this particular conspiracy clearly constituted "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The affidavits certainly

supported the determination to authorize the wiretaps.  See <u>Nelson-Rodriguez</u>, 319 F.3d at 32-33.

B.          <u>Alleged Misleading Information</u>

Meléndez argues that the affidavits failed to disclose that the agent who signed them was himself of Dominican origin, as was one of the confidential sources, and that they understated the scope of that source's knowledge about the internal workings of the criminal conspiracy.  These arguments are in service of Meléndez's hypothesis that someone of Dominican origin could easily have been slipped into the organization as an undercover agent, and that alternatively, the confidential source must already have had sufficient knowledge about the conspiracy's organization, both facts obviating any need for wiretaps.

Meléndez takes it one step further and argues that because these facts were so obviously material, the affidavit misled the district court judges who authorized the wiretaps into authorizations they would not otherwise have granted.  See <u>Franks</u>, 438 U.S. at 171-72 (holding that if "deliberate falsity or reckless disregard" for the truth in a warrant affidavit are specifically and reliably alleged, and if there is no longer sufficient material to support a finding of probable cause when the material in question "is set to one side," the court must grant the defendant a hearing to prove the allegations).

-8-

This house of cards is too flimsy to stand. To be of Dominican origin does not make one a natural undercover agent (or inconspicuous as part of a criminal sub-culture); nor does it mitigate the likelihood of an agent or confidential source being murdered by the conspiracy upon discovery.[1] Meléndez's speculation that the confidential source must already have known and shared with the investigators the details of the conspiracy's inner workings before the wiretap application is equally illogical and unsupported. No inference of falsity or reckless disregard of the truth can be drawn from the non-disclosure of these irrelevant bits of information. For that reason no hearing was required. See Franks, 438 U.S. at 155-56. Nor did the ample probable cause set forth in the affidavit for tapping the phones depend in any way on these alleged omissions, also obviating the need for a Franks hearing. See Nelson-Rodriguez, 319 F.3d at 34.

II. Defendant's Incriminatory Statements to Investigators

After evidentiary hearings on two days, the district court made findings of fact and concluded that statements Meléndez had made while in custody were voluntary under the Fifth Amendment and that Meléndez had intelligently waived any right to counsel under the Sixth Amendment. Melendez II, 544 F. Supp. 2d at 85-89.

---

[1] Indeed, as the affidavit explained, the confidential source Meléndez refers to was in custody at the time of the application because members of the conspiracy already distrusted him and had threatened his life.

-9-

We review the factual findings for clear error.  United States v. Rojas-Tapia, 446 F.3d 1, 3 (1st Cir. 2006).  But as to determinations on matters of law, such as whether the totality of the circumstances demonstrates that a defendant's statement was knowing and voluntary, our review is de novo.  Id.

As to Fifth Amendment rights, the Supreme Court recently summarized the familiar Miranda rule in Maryland v. Shatzer, 130 S. Ct. 1213 (2010):

> To counteract the coercive pressure [of a custodial interrogation], Miranda announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney.  After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease.  Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present.  Critically, however, a suspect can waive these rights.  To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary . . . .

Id. at 1219 (citations omitted).  If a suspect invokes the right to have counsel present during custodial interrogation, further interrogation may take place without counsel only if "the accused himself initiates further communication, exchanges, or conversations" with the authorities.  Id. (quoting Edwards v. Arizona, 451 U.S. 477, 485 (1981)).

As to the Sixth Amendment right to counsel, it attaches at or shortly after "the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing,

-10-

indictment, information, or arraignment."[2]  United States v. Boskic, 545 F.3d 69, 81 (1st Cir. 2008) (quoting Rothgery v. Gillespie County, Tex., 554 U.S. 191, 198 (2008)) (internal quotation marks omitted).  These rights may also be waived, and "a valid waiver of Fifth Amendment rights typically will suffice to accomplish a waiver of the Sixth Amendment right to counsel in the context of police questioning of a defendant."  Id. at 84 n.17.

The dispute concerns Meléndez's several confessions to the federal agents of his role in the conspiracy.  There is no assertion that the district court misapprehended or misapplied the law on waiver of these rights.  Rather, Meléndez attacks the district court's judgments that the government's witnesses were credible and Meléndez was not in recounting the events following his arrest.

We briefly summarize the testimony at the suppression hearings of FBI Agents Juan Berrios Silva and Felix Rivera, and of Meléndez.  Meléndez was arrested at his home just after 5:00 a.m. on September 13, 2005 by Agent Berrios and others and initially taken into custody at FBI offices.  He testified that he was first

---

[2]  In this case, the indictment against the co-conspirators was filed before Meléndez was arrested.  Meléndez argues, and the government does not dispute, that as a result his Sixth Amendment right to counsel had already attached when he was first arrested, so that it covered his interviews with federal agents both before and after his initial appearance before the magistrate judge.  The analysis that follows assumes without deciding that he is correct about the timing.

-11-

advised of his rights under Miranda while en route, and was then given a written form explaining those rights in Spanish upon arrival at the Federal building. The parties agree that the bottom portion of the form, which contained an assent to waiver of Meléndez's rights, was crossed out before he signed the form at 6:45 a.m, because he was not at that time waiving his rights. Meléndez admits he then went to Pretrial Services where he was given Miranda warnings a third time.

Agent Berrios and defendant Meléndez testified rather differently regarding what happened after Meléndez was returned to the processing room from Pretrial Services, and the district court credited the agent's testimony. Agent Berrios testified that Meléndez approached him and another FBI agent and told them he wanted to cooperate, then spoke with them voluntarily for close to an hour, confessing to his role in the conspiracy. The next day, Berrios prepared an FBI Form 302 summarizing Meléndez's debriefing and the information obtained. Meléndez was kept separately from the other detainees after he was debriefed.

Meléndez testified, by contrast, that he had specifically and repeatedly requested his own lawyer from the time he was first read his Miranda rights, that he had been told that after he cooperated the agents would call his attorney, and that despite the agents' constant pressure on him he had consistently refused to cooperate.

At about 1:30 p.m. the same day, Meléndez was taken before a magistrate judge for his initial appearance. The judge advised him of his right to consult counsel, but Meléndez, as his own testimony established, did not request an attorney.[3] It is undisputed that Meléndez did not say he had already requested an attorney but had been denied one, that he was being pressed to waive his right to counsel, or that he had already been interviewed in violation of his rights. Berrios testified that the prosecutor told the judge at sidebar that Meléndez had decided to cooperate. It is undisputed that Meléndez was returned to the custody of the FBI after his initial appearance, which Berrios testified happened only in order to facilitate Meléndez's cooperation with the investigation.

Berrios testified that, wanting Meléndez to feel comfortable because he was cooperating, the agents took him to a hotel after that initial appearance, and not to jail, as would usually happen. Another agent, Felix Rivera, was present at the hotel and testified at the suppression hearing consistently with Agent Berrios that Meléndez was indeed relaxed and comfortable at

---

[3]   For reasons that are not clear, no transcript or recording of the initial appearance has been located or presented to us. We rely on the trial judge's findings of fact as to what happened at the initial appearance. In addition, there is no reason to believe that this highly experienced magistrate judge did not advise Meléndez of his right to counsel at his appearance after his arrest. Meléndez in fact testified that he was read his rights before the magistrate judge and did not ask for a lawyer.

-13-

the hotel, that he made a few fruitless phone calls to co-conspirators who would not speak because they already knew he had been arrested, and that he did not request counsel in either agent's presence. Both agents testified that the next morning, September 14, Meléndez was taken to a government building where he was debriefed in more depth by several agents, including Berrios and Rivera, at which time he cooperated without ever requesting counsel or expressing reluctance to cooperate, and after which Rivera prepared another FBI Form 302 summarizing the interview. After the interview, the agents consulted with the prosecutors, who determined Meléndez should be taken to the federal prison.

Meléndez testified that he was terrified to be taken to the hotel because he thought he was being kidnapped, and that he had refused to make any calls while there. He testified that during the second interview the next morning he had continued to adamantly refuse to cooperate, confess, or make calls, and had continued to ask to see an attorney.

The district court decided to "afford total credibility" to the agents' testimony rather than to Meléndez's version of events. Melendez II, 544 F. Supp. 2d at 86. The court found that each agent's testimony was delivered credibly and was consistent with the other's "even after being rigorously cross examined" by defense counsel. Id. at 85. And circumstantial evidence corroborated the agents' testimony that Meléndez was voluntarily

-14-

cooperating with the agents during the two days following his arrest, including that the magistrate judge left Meléndez in the custody of the FBI after his initial appearance, that he was taken to a hotel instead of to jail following his initial appearance, and that he did not ask for a lawyer before the magistrate judge even when advised he had a right to consult one. Id. at 85-86.

Crediting the agents' testimony, the district court found as fact that during those two days, Meléndez was calm, collected, and capable of intelligent and voluntary waiver of his rights. Id. at 86 n.1. The court found that he initiated the first interview with the agents, and that he did not ask for an attorney, did not say he did not want to cooperate, and did not ask to stop any of the interviews. Id. at 86.

We have reviewed the transcripts of the suppression hearing and conclude that there is no clear error in the district court's findings of fact. "Where a district court's 'factual findings are based on credibility determinations[,] . . . error is seldom considered "clear" unless the credibility assessments were based on testimony which was inherently implausible, internally inconsistent, or critically impeached.'" United States v. Merlino, 592 F.3d 22, 27 (1st Cir. 2010) (quoting Awon v. United States, 308 F.3d 133, 141 (1st Cir. 2002)) (alteration and omission in original); see also United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) ("When faced with conflicting testimony and nothing

more, the district court's decision to believe one witness instead of another and to draw an appropriate conclusion cannot be considered clearly erroneous."). Meléndez makes no allegation of inconsistency or impeachment, and the complaints he raises that the agents failed to produce a signed waiver, a cooperative agreement, a recording of the interviews, or a signed statement from Meléndez do not establish inherent implausibility or other basis for a finding of clear error.

Nor was there any error in the district court's conclusion of law on these facts that Meléndez had knowingly and voluntarily decided to cooperate, without counsel, in both of his interviews, waiving his Fifth and Sixth Amendment rights. He initiated his first interview on September 13 himself after being advised twice of his Miranda rights. Even later, after being advised of both his Fifth and Sixth Amendment rights by the magistrate judge at his initial appearance, he continued to cooperate without reluctance and without requesting counsel. The court did not err in its conclusion that, under all the circumstances, Meléndez voluntarily and intelligently waived both his right to remain silent and his right to counsel as of the time he made his statements.[4] See United States v. Thongsophaporn, 503

---

[4] We add that no plausible question was ever raised on this time frame of the Miranda warnings wearing off before either of the interviews on September 13th and 14th. See United States v. Anthony, 474 F.2d 770, 773 (5th Cir. 1973) ("[T]here is no requirement that an accused be continually reminded of his rights

-16-

F.3d 51, 56 (1st Cir. 2007) (stating standard for waiving Fifth Amendment rights once invoked when defendant subsequently initiates conversation with officers); <u>United States</u> v. <u>Leon-Delfis</u>, 203 F.3d 103, 110-11 (1st Cir. 2000) (stating Sixth Amendment waiver standard and congruence with Fifth Amendment standard).

The judgment of conviction is affirmed.

---

once he has intelligently waived them."). Nor could there be, even if there were such a requirement: Meléndez was read his rights three times the day of his arrest, and the interviews at issue were over less than two days later.